**FALL RIVER SAVINGS BANK,**
**Petitioner,**

v.

**NATIONAL LABOR RELATIONS**
**BOARD, Respondent.**

**No. 80–1579.**

United States Court of Appeals,
First Circuit.

Argued March 5, 1981.

Decided May 22, 1981.

Joseph W. Ambash, Boston, Mass., with whom Kevin J. Fitzgerald and Foley, Hoag & Eliot, Boston, Mass., were on brief, for petitioner.

Richard S. Zuckerman, Atty., Washington, D. C., with whom William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., were on brief, for respondent.

Before CAMPBELL, BOWNES and BREYER, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Fall River Savings Bank petitions for review of an order requiring it to bargain with Local 1325 of the United Food and Commercial Workers. The Board cross-petitions for enforcement of its order.

█ Fall River Savings Bank (the Bank) operates out of five branch offices in the Fall River, Massachusetts area, in addition to its main office in Fall River. Each branch office is staffed by a Branch Mana-

ger, an Assistant Branch Manager,[1] from one to four tellers, and a janitor. The main office is the headquarters for the Bank's officers and professional staff; a number of tellers also work there. On February 28, 1978, Local 1325 of the Retail Clerks International Association petitioned the Board for certification as the bargaining representative of all the Bank's regular full- and part-time employees, excluding "supervisors and guards as defined in the Act." On March 24, 1978, the Retail Clerk's Union and the Bank entered into a "Stipulation for Certification upon Consent Election," which defined the bargaining unit as:

All regular full-time and part-time employees at the Employer's Offices . . . excluding the president, vice-presidents, assistant vice-presidents, treasurers, assistant treasurers, branch managers, guards and supervisors as defined in the Act.

The election was held on April 28, 1978. Of 44 uncontested votes, 23 were for the Union and 21 against. Seven ballots were challenged; when these ballots were eventually opened after the Board's ruling on exceptions, the final tally was 28 votes for the Union and 23 against. The Bank filed timely objections to the conduct of the election, all of which were rejected by the Regional Director. The Board adopted most of the Regional Director's recommendations, but directed that a hearing be held to receive evidence on two categories of objections. The hearing was to focus on: 1) the supervisory or employee status of the five Assistant Branch Managers; and 2) the effect of the pro-union activity of various supervisory personnel.[2] After nine days of

hearings, held between October 23 and November 21, 1978, the Administrative Law Judge (ALJ) recommended that the objections be overruled and that the challenged ballots be opened. On December 6, 1979, the Board issued its "Supplemental Decision and Direction" adopting the ALJ's recommendations. This decision included a footnote which stated:

On June 7, 1979, the Retail Clerks International Association and the Amalgamated Meatcutters and Butcher Workmen of North America merged, forming the United Food and Commercial Workers Union, AFL–CIO. The name of the Union herein, formerly Local 1325, Retail Clerks International Association, has been amended to reflect this change.

The Union was certified on December 20, 1979. The Bank did not seek reconsideration of either the December 6 decision or the Certification two weeks later.

Between December 20, 1979 and January 7, 1980, the Union sent to the Bank at least three letters requesting that bargaining sessions be scheduled. Each such letter was sent on stationery bearing the letterhead of the "United Food and Commercial Workers International Union, AFL–CIO, Local No. 1325." The Bank responded on January 10, 1980, essentially reasserting its previous objections to the election. The Union then filed a charge with the Board, which, on January 29, 1980, issued a complaint charging the Bank with refusing to bargain in violation of sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (5).

1. The use of this term has become a bone of contention between the parties; several witnesses testified that these persons were commonly referred to as "backup tellers" up to the time of the Union campaign, suggesting that the term "Assistant Branch Manager" was introduced in an effort to endow them with supervisory status for purposes of the labor law. Since job titles are not determinative of supervisory status, *NLRB v. Sayers Printing Co.*, 453 F.2d 810, 815 (8th Cir. 1971), the dispute has no bearing on our decision; we find it convenient to use the title "Assistant Branch Manager" here.

2. The Board's decision referred specifically to the allegations described in paragraphs B1, B5 and D2 of the Regional Director's report. These allegations involved: 1) attendance at Union meetings by Branch Managers, Assistant Branch Managers, and Assistant Treasurers, and pro-union speeches at one such meeting by one Branch Manager and one Assistant Branch Manager; 2) pro-union letters distributed to employees by one Branch Manager and one Assistant Branch Manager; and 3) visits by an Assistant Branch Manager on behalf of the Union to the home of one employee.

The Bank answered the complaint on February 13 reasserting several of its objections to the election. Upon motion by the general counsel, the Board on March 25, 1980 transferred the proceeding to itself and issued a notice to show cause why summary judgment should not be granted. On April 14, 1980, the Bank amended its answer to raise, for the first time, a defense based on the merger between the Retail Clerks International Association and the Amalgamated Meatcutters and . Butcher Workmen. The Board refused to address this issue on the ground that it was not timely raised; it granted summary judgment for the general counsel, along with the order now under review, on July 24, 1980.

The Bank raises four issues for our consideration: 1) whether the Assistant Managers of the three largest branches are "supervisors" as defined in section 2(11) of the Act, 29 U.S.C. § 152(11);[3] 2) whether the pro-union conduct of supervisors requires that the election be set aside; 3) whether the Board erred in refusing to grant a hearing on the Bank's allegation of a threat made by one supervisor to an employee; and 4) whether the Board's certification of the United Food and Commercial Workers is invalid because of the Board's failure to inquire into the validity of the merger between the Retail Clerks International Association and the Amalgamated Meatcutters. We resolve each of these issues against the Bank and enforce the Board's order.

## I. *The Status of the Assistant Branch Managers*

██ Section 2(3) of the Act, 29 U.S.C. § 152(3), excludes from the definition of "employees" for the purpose of the Act "an individual employed as a supervisor." Section 9(b), 29 U.S.C. § 159(b), in turn limits to employees the persons who may be included in bargaining units designated by the Board. Section 2(11) defines the term "supervisor" as follows:

> The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or reasonably to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

"By well-settled construction, this section is to be read in the disjunctive, with the existence of any one of the statutory powers sufficient to confer supervisory status." *Maine Yankee Atomic Power Co. v. NLRB*, 624 F.2d 347, 360 (1st Cir. 1980); *NLRB v. Magnesium Casting Co.*, 427 F.2d 114, 117 (1st Cir. 1970), *aff'd*, 401 U.S. 137, 91 S.Ct. 599, 27 L.Ed. 735 (1971). We have repeatedly held that application of the statutory test is a question of fact for the Board, *Stop & Shop Companies, Inc. v. NLRB*, 548 F.2d 17, 18 (1st Cir. 1977); *NLRB v. Magnesium Casting Co., supra; NLRB v. Swift & Co.*, 292 F.2d 561, 563 (1st Cir. 1961). While the Board's discretion in this area is not unlimited, *Maine Yankee Atomic Power Co. v. NLRB, supra; NLRB v. Metropolitan Petroleum Co.*, 506 F.2d 616 (1st Cir. 1974), the Board's determination should be sustained if supported by substantial evidence.

The Bank contends that Assistant Branch Managers are supervisors primarily because they are in charge of the branch during the absence of the Branch Manager. The parties stipulated to the supervisory status of Branch Managers, who are ordinarily the highest ranking persons present in each branch. While both Managers and Assistant Managers spend much of their work day performing the routine chores of a teller, Branch Managers, and to a lesser degree Assistant Managers, perform some functions which tellers do not perform. Managers open the branch with a key; they turn on the branch computers with a "supervisory override" key; they initiate and assist tellers in the process of "proving out" in which each teller balances his or her trans-

---

**3.** The Bank has not challenged the Board's conclusion with respect to the Assistant Managers of the two smallest branches. We therefore do not consider these individuals.

actions at the end of the day; they accept applications for loans, which are then forwarded to the main office; they approve passbook loans through application of a mathematical formula; they authorize the cashing of particularly large checks; they sign bank checks; and they assign tellers to windows according to a pre-arranged rotation system. With regard to personnel management, there was some conflicting testimony, but the Board reasonably found that hiring, firing, promotions and salary increases were all handled by the main office, without significant reliance on recommendations from the branches, and that Branch Managers would discipline tellers formally only after consultation with the main office.

Managers are absent from their branches during lunch hours, management meetings (which Assistant Managers do not attend), illness, and vacations, although there was testimony that higher officials from the main office make a practice of supervising at branches when Branch Managers are absent for extended periods. Also, Assistant Managers rotate with Managers for work on Saturday mornings, when the branches operate with a reduced staff. On these occasions, unless a supervisor from the main office is present, the assistant Branch Manager is the highest ranking person in the branch.

■ We have had several occasions to consider the status of employees who, while otherwise serving as ordinary workers, are occasionally called upon to take charge of others during the absence of a superior. *NLRB v. Sayers Printing Co.,* 453 F.2d 810 (1st Cir. 1971); *NLRB v. Magnesium Casting Co.,* 427 F.2d 114; *NLRB v. Swift & Co.,* 292 F.2d 561; *NLRB v. Quincy Steel Casting,* 200 F.2d 293 (1st Cir. 1952). We have taken the position in such cases that "spasmodic and infrequent assumption of a position of command and responsibility does not transform an otherwise rank and file worker into a supervisor." *Quincy Steel Casting,* at 296. While the Bank seeks to distinguish these cases, arguing that Assistant Branch Managers take charge on a more regular than "spasmodic" basis, we think the Board could properly view the limited occasions on which Assistants were in charge as a factor significantly weakening the claim of managerial status.

Moreover, even on those occasions when the Managers were absent, the Board could find, on this record, that the duties performed by Assistant Managers did not involve significant supervisory authority. The Bank argues that the Assistant Branch Managers, on these occasions, possess authority responsibly to direct and to discipline tellers. As a primary example, the Bank cites the "proving out" process. This process is essentially a matter of checking computations to insure that the transaction records are accurate. Each teller proves his or her own window; from the testimony the Board could find that the primary role of the person in charge is to initiate the process by instructing the first teller when to begin. If a teller is unable to prove, the person in charge, as well as other tellers, may assist him or her in searching for the error. If the error is not found by closing time, the manager directs the tellers to continue looking for it; but several witnesses testified that this process never continues for longer than an hour, after which time the employees all leave and continue the search the next day. The Board concluded that this process is "routine or clerical," not requiring "the use of independent judgment," and we find substantial record support for this conclusion. *See Goldies, Inc. v. NLRB,* 628 F.2d 706 (1st Cir. 1980) ("countermen" who occasionally assign tasks to "partsmen" and give them instructions found not supervisors).

The Bank contends that Assistant Branch Managers have authority to discipline tellers. In support of this, the Bank relies on three incidents. In one, Assistant Branch Manager Griffin had experienced what he termed a "personal conflict" with Charlotte Snell, a teller who had worked unsuccessfully in several branches and was being given a last chance at Griffin's branch. Feeling unable to bring the problem to the Branch Manager because of her friendship with

Snell, Griffin went to Charles Murray, then Vice President, and suggested that Snell be transferred to another branch. Murray then discharged Snell. The Board reasonably concluded that the incident was "an isolated instance with unusual circumstances and not indicative of supervisory authority." Griffin obviously had no authority to take any independent action against Snell, and even his recommendation of transfer was not followed. Snell's discharge appears to be less the result of any recommendation by Griffin than of her long history of inadequate performance. *See Stop & Shop Companies, Inc.*, 548 F.2d 17 (pharmacy managers whose recommendations on hiring and firing were sometimes ignored found to have no authority "effectively to recommend" such action).

In a second incident, the Bank asserts that Assistant Manager Gail Silva once "directed" an employee not to report to work on a Saturday. Silva's testimony was that, when the teller called in at 11:00 to say that she had just awoken, Silva replied, "Well . . . I don't know what to tell you, but for an hour and a half it would be foolish to come in." The Board saw nothing in this incident to suggest an exercise of supervisory authority, nor do we. A third incident relied upon by the Bank, involving a written warning issued (after the election) by Assistant Manager Nancy Savage Ferreira to a teller who was absent without excuse, similarly failed to prove supervisory status. The warning was issued only after clearing with, and on instructions from, the main office.

█ The Bank argues also that Assistant Managers have authority to train and evaluate new tellers. This activity was mentioned by only one witness, and then in vague terms. By itself such activity, if it occurred, would not establish supervisory status; experienced employees may instruct new personnel without possessing supervisory authority. *See Magnesium Casting,*

427 F.2d at 118 (not unusual that most skilled workers would command respect even though not supervisors). Similarly, management's solicitation, in this context, of the opinions of more experienced employees about the performance of newcomers did not necessitate a finding of supervisory status.

Other duties cited by the Bank as managerial, such as possession of the branch and computer keys, power to approve check-cashing, and authority to sign checks, are not directly related to supervision of employees. These responsibilities do indeed suggest that Assistant Managers are among those persons whom the bank considers particularly reliable and trustworthy. But we cannot say that such duties and traits required a finding that Assistant Managers play a role in which "they must be representatives of the interests of their employer vis-a-vis other employees." *Stop & Shop Companies, Inc. v. NLRB*, 548 F.2d at 17. Nor does the slightly higher pay received by Assistant Managers compel a finding of supervisory authority.[4] Pay differential may be explained by any number of differences in skill, seniority, responsibilities, or market power; here the Board could rationally attribute it to seniority, experience, and the various other responsibilities of a non-supervisory nature assigned to Assistant Managers. *See NLRB v. Metropolitan Petroleum Co.*, 506 F.2d 616 (dispatchers paid less per hour than drivers whom they supervised); *NLRB v. Sayers Printing Co.*, 453 F.2d at 815 (higher pay "of no legal significance").

█ The Board has a large measure of informed discretion when it comes to deciding who, as a practical matter, falls within the definition of supervisor. *Stop & Shop Companies, Inc. v. NLRB*, 548 F.2d at 18; *NLRB v. Swift & Co.*, 292 F.2d at 563. We find substantial record support for its determination.

---

**4.** There was testimony that tellers were paid between $106 and $133 per week at the time of the election. Assistant Branch Managers received "in the area of" $144 to $146. Branch Managers, unlike tellers and Assistants, were paid on an annual basis, at a rate of between $8,000 and $12,000. Tellers and Assistant Branch Managers fill out weekly time reports; Branch Managers do not.

**56**

## II. *Pro-Union Activity of Supervisors*

■ The Bank contends that the election should be set aside because pro-union activity by certain of its own supervisors interfered with the "laboratory conditions" under which the election was conducted. The Board has a "wide degree of discretion" in matters relating to representation proceedings, *NLRB v. A. J. Tower Co.*, 329 U.S. 324, 334, 67 S.Ct. 324, 329, 91 L.Ed. 322 (1946). A party urging that an election be set aside carries the "heavy burden" of demonstrating that the Board has abused its discretion. *Melrose Wakefield Hospital Association v. NLRB*, 615 F.2d 563, 566 (1st Cir. 1980); *NLRB v. S. Prawer & Co.*, 584 F.2d 1099, 1101 (1st Cir. 1978). The Board has found pro-union activity by supervisors objectionable on two possible grounds: first, it may lead employees to the false conclusion that their employer favors the union; and second, it may cause employees to support the union out of fear of retaliation by the particular supervisors rather than out of free choice. *Stevenson Equipment Co.*, 174 NLRB 865 (1969). *Accord, Catholic Medical Center v. NLRB*, 620 F.2d 20 (2d Cir. 1980) (employees may be confused or coerced); *NLRB v. San Antonio Portland Cement Co.*, 611 F.2d 1148 (5th Cir. 1980) (supervisory support objectionable only if it contains "seeds of reprisal"); *see also NLRB v. Underwood Machinery*, 179 F.2d 118 (1st Cir. 1949) (supervisors' solicitation of union authorization cards objectionable only if "the signing employee was subject to a reasonable apprehension that his failure to sign could have adverse consequences"). Unless one or both of these effects appears to have flowed from the supervisors' conduct, the Board has declined to set aside an election.

■ The Bank's complaints of pro-union activities by supervisors here center on the activities of certain Assistant Branch Managers. Our holding in Part I makes it unnecessary to address these claims. The Bank's remaining objections relate to the conduct of several Branch Managers and an Assistant Treasurer. The Bank contends that these personnel attended numerous union meetings and invited other employees to do so; that one Branch Manager volunteered to telephone and visit employees on behalf of the Union, made a pro-union speech, and sent a letter to employees expressing support for the Union; that another Branch Manager was elected to be the employees' "liaison with the union" and on one occasion questioned a teller as to how she would vote; and finally that an Assistant Treasurer made a pro-union speech at one meeting.[5]

The Board found support for some, but not all, of these claims, and our review of the record persuades us of the reasonableness of the Board's findings. Generally, the Board found that several supervisors made known their support for the Union, but that no supervisor ever told any employee how to vote or threatened any form of retaliation against employees who failed to support the Union. The Board found also that Bank management expressed unambiguous opposition to the Union in a series of strongly worded letters to employees. On the basis of these factual findings, the Board concluded that the activities of supervisors neither misled employees as to the Bank's position nor caused them to fear retaliation, and that there was therefore no need to set aside the election.

The Bank does not challenge the standards applied by the Board; its argument is that the supervisors' activities did in fact mislead employees and cause fear of retaliation. First, the Bank asserts that employees may have been confused about manage-

---

5. The Bank contends, somewhat inconsistently, both that its management was unaware of the extent of supervisory support for the Union, and that it attempted to control the activity of supervisors but was unable to do so. The Board found, on the basis of explicit testimony, that Bank officers were told of the supervisors' activities early in the union campaign; thus the Bank could have taken steps to head off any unwanted conduct by them. The reason supervisors are unprotected by the Act is precisely that employers are entitled to demand their complete loyalty—and take disciplinary measures to secure it. An employer who fails to exercise its authority may not later be heard to complain of the results of its inaction. *NLRB v. Lamar Electric Membership Corp.*, 362 F.2d 505 (5th Cir. 1966).

ment's position since "the bank's employees cannot be expected to be able to adequately understand that the very real, pro-union proselytizing by supervisors is to be differentiated from the abstract concept of the position of 'Bank management.'" We find nothing in the record that necessitates a finding that any such confusion existed—and much to indicate that the employees could and did make this distinction. Each employee who was questioned on the subject demonstrated a clear understanding of the identity of Bank management and of its views on the Union campaign.

The Bank's second contention is that the supervisor's "active and vocal" support for the Union coerced employees by implying threats of retaliation. We think the Board was entitled to reject this contention. It is clear that certain supervisors favored the Union, and that employees knew this; but without evidence of any threats, express or implied, this does not compel a finding of coercion. *Compare Turner's Express v. NLRB*, 456 F.2d 289 (4th Cir. 1972) (foremen warned employees that they would "get tough" if the Union lost, and that anti-union employees would "pay for it"). Here there was no significant evidence of threats,[6] and none that any employee feared retaliation; those employees who were asked about such fears stated that they had none.[7]

■ In rejecting the Bank's claim of coercion by Branch Managers, the Board relied also on the Managers' limited power to retaliate against tellers. The Bank criticizes this reasoning, quoting *Turner's Express v. NLRB*, 456 F.2d 289, for the point that an employee's immediate supervisor may be more influential than a more distant corporate official. In *Turner's Express*, however, the immediate supervisor

had substantial influence on hiring, firing, and wage-setting; here the Branch Managers' ability to injure the interests of tellers was more limited. *See NLRB v. Kane*, 435 F.2d 1203 (4th Cir. 1970) (low level of supervisor's authority weighs against inference of coercion). Thus we think the Board could take into account the relatively limited power of the Managers as well (far more importantly) as the absence of threatening conduct, in refusing to set aside the election on grounds of coercion.

III. *The Alleged Threat by Pimental*

■ The Bank complains that it has been denied due process by the Board's refusal to grant a hearing on an incident it describes as an "express threat" by Assistant Treasurer Pimental to Debra Paulhus, a clerical employee. According to the Bank, Pimental asked Paulhus' husband how Paulhus intended to vote. Mr. Paulhus replied that he did not know, and Pimental told him that in 1977 Debra had been on a "hit-list" of employees to be fired by Vice President Murray. The Bank has raised this incident, both before the Board and in this court, as an example of "supervisory pressure" on an employee; the Bank has not attempted to put forward any theory of this incident as part of a union-organized campaign to mislead employees with false rumors about management's plans. The Board saw no "substantial and material issue" arising from this incident as it was presented by the Bank, and that conclusion was within the Board's discretion. Pimental is not alleged to have suggested that he himself had some intention of firing Paulhus if she failed to support the Union. Taking the Bank's account of the incident as true, the Board could reasonably conclude that the incident did not demonstrate coercion by a

---

6. We find reasonable the Board's disagreement with the Bank's characterization of Branch Manager Boleski's letter as containing "thinly veiled threats."

7. The Bank cites the testimony of teller Clare Pires, who stated:

I figured that if I said I was for the union the other bank management basically from downtown wouldn't like it, and if I said I was against the union the people I have to work with every day wouldn't like that too much either. But I still had to make up my own mind.

This scarcely compels a finding that Pires feared retaliation from anyone, let alone that supervisors would retaliate because of an anti-union stance.

supervisor and therefore was not a basis for setting aside the election. No hearing, therefore, was necessary.

## IV. *The Union Merger*

As outlined in the statement of the facts, the Board certified the United Food and Commercial Workers on December 20, 1979, after having noted in its order of December 6 that this Union was the result of a merger between the petitioning Retail Clerks International Association and another Union. The Bank raised no objection to the substitution of the new Union for its predecessor until it filed its amended answer to the unfair labor practice charge on April 14, 1980.[8] At that time the Board refused to address the issue, citing its rule against litigation in an unfair labor practice proceeding of issues which could have been raised in the representation proceeding. The Bank now argues that it has been denied a hearing on the validity of the merger, and that the Board's action in certifying the new Union without affording such a hearing was beyond its power.

Union mergers are a relatively frequent occurrence, and the Board has developed a set of procedures for responding to them. Ordinarily, the successor union petitions for amendment of the certification of representation under 29 C.F.R. § 102.61(e). The Board then conducts an inquiry, in which the employer may participate if it wishes, to determine whether the merger was accomplished through valid procedures and whether the resulting union continues to represent the unit employees. If the Board is satisfied that these criteria are met, it then amends the certification to reflect the merger, and the new union assumes the position of the old. On review, the courts have treated the Board's determination as one of fact, to be upheld if supported by substantial evidence. *E. g., NLRB v. Bear Archery*, 587 F.2d 812 (6th Cir. 1977); *NLRB v. Pearl Bookbinding*, 517 F.2d 1108 (1st Cir. 1975); *NLRB v. Commercial Letter, Inc.*, 496 F.2d 35 (8th Cir. 1974).

 Here, the record contains no formal petition by the United Food and Commercial Workers,[9] and no evidence of any inquiry by the Board.[10] The Board's action, *sua sponte*, and without any record support, was irregular. Had the Bank raised a timely objection to this procedure, we think the Board would have had an obligation to afford either the usual procedure or some reasonable equivalent in which the Bank might contest the validity and effect of the merger. *Pepper and Tanner Co. v. NLRB*, 474 F.2d 1256 (6th Cir. 1973). But the Bank failed to do so. The Board was within its discretion in refusing to address the matter when, later, it was raised.

Under the Board's longstanding rule and practice, *see* 29 C.F.R. § 102.67(f), which the courts have repeatedly endorsed, a party to an unfair labor practice proceeding may not raise an issue which was or could have been litigated in the prior representation proceeding, in the absence of newly discovered or previously unavailable evidence or special circumstances. *Magnesium Casting Co. v. NLRB*, 401 U.S. 137, 141–42, 91 S.Ct. 599, 601, 27 L.Ed.2d 735 (1971); *Pittsburgh Plate Glass Co. v. NLRB*, 313 U.S. 146, 162, 61 S.Ct. 908, 917, 85 L.Ed. 1251 (1941); *S. D.*

---

**8.** The Bank asserts that it raised this issue both in its letter to the Union and in its first answer by stating that it would not recognize the Union as the lawfully certified representative of the bargaining unit. We have examined both these documents, and we find nothing in either to put the Board or the Union on notice that the Bank intended to contest the merger.

**9.** Since no Union had yet been certified at the time of the merger, the Union could not have petitioned for amendment of certification. It could, however, have accomplished the same result by moving for amendment of the repre-

sentation petition filed by the Retail Clerks Union. The record does not indicate whether the Union did so or not.

**10.** The Board's present position is that it "did nothing more than amend the name of the Union's international affiliate," and that in doing so it merely chose not to "ignore the realities of life." This position begs the question, however; without any inquiry having been conducted, it is impossible to know whether the merger effected a mere change of name or whether its impact was more substantial.

*Warren Co. v. NLRB*, 353 F.2d 494, 497 (1st Cir. 1965), *cert. denied*, 383 U.S. 958, 86 S.Ct. 1222, 16 L.Ed.2d 300 (1966).

The Bank argues that it had no opportunity to raise the issue in the representation proceeding, since it was unaware of the merger until the Board's order of December 6, at which time the representation proceeding was effectively concluded. The Board determined, however, that the Bank could have raised the issue by way of a motion for reconsideration under Rule 102.65(e)(1), which provides, in part, as follows:

> A party to a proceeding may, because of extraordinary circumstances, move after the close of the hearing for reopening of the record, or move after the decision for reconsideration or rehearing, except that no motion for reconsideration or rehearing will be entertained pursuant to this paragraph by the regional director with respect to any matter which can be raised before pursuant to any other section of the rules in this part, or by the Board with respect to any matter which could have been but was not raised before it pursuant to any other section of the rules in this part.

The rule permits the filing of a motion within ten days after service of the decision in the proceeding. Since the decision in the representation proceeding occurred on December 20, the Board says the Bank could have filed a motion as many as 24 days after the December 6 order had alerted it to the merger. The Board also points out that the rule allows a party to request an extension of time for filing a motion, so that the Bank might have requested and obtained additional time. 29 C.F.R. § 102.65(e)(2).[11]

The Bank argues that a motion for reconsideration would not have been appropriate here, or at least that the rule failed to give notice of its applicability to a case such as this. The Bank interprets the rule as limited to claims of factual errors made during the consideration of election objec-

tions already raised by the parties. For this, the Bank cites no cases, but relies on language referring to "any finding of material fact" and to "additional evidence sought to be adduced" contained in the following part of the rule:

> A motion for reconsideration shall state with particularity the material error claimed and with respect to any finding of material fact shall specify the page of the record relied on. A motion for rehearing shall specify the error alleged to require a hearing de novo and the prejudice to the movant alleged to result from such error. A motion to reopen the record shall state briefly the additional evidence sought to be adduced, why it was not presented previously, and what result it would require, if adduced and credited. Only newly discovered evidence, evidence which has become available only since the close of the hearing, or evidence which the regional director or the Board believes should have been taken at the hearing, will be taken at any further hearing.

We do not think this language necessarily limits motions for reconsideration in the manner claimed. Doubtless most motions relate to errors having their genesis in prior proceedings. A movant is thus told by this part of the rule that in cases of an error of procedure or of law, he must state the error with particularity, while in cases of an error of fact, he must make specific reference to the record. The rule goes on to describe the type of evidence that may be taken at a rehearing, limiting such evidence to newly discovered or previously unavailable material. We read this language as limiting the evidence that may be introduced when the issue reopened is one which has already been considered, but we see nothing to indicate a firm intention to limit the types of issues that may be raised. The cases offer no hint that the rule is limited in the way the Bank suggests. *See Garment Workers v. Quality Manufacturing Co.*, 420 U.S. 276,

11. At oral argument, the Bank sought to explain its delay by saying that it needed time to question its employees as to their knowledge of the merger before it could determine whether it had grounds to contest the validity of the merger. Were this so, it could have sought an extension of time, which it did not do.

281 n.3, 95 S.Ct. 972, 975, n.3, 43 L.Ed.2d 189 (1975) (employer claims due process violation in Board order based on theory not charged or litigated; Court refuses to consider because of employer's failure to move for reconsideration); *NLRB v. Local 345,* 612 F.2d 598 (1st Cir. 1980) (Union moved for reconsideration of order in which Board *sua sponte* amended ALJ's proposed order); *NLRB v. Beth Israel Hospital,* 554 F.2d 477, 482 n.4 (1st Cir. 1977), *aff'd,* 437 U.S. 483, 98 S.Ct. 2463, 57 L.Ed.2d 370 (1978) (employer contests Board's *sua sponte* expansion of litigated issue; failure to seek reconsideration no bar because Board's ruling too ambiguous to provide notice of its scope). *See also NLRB v. Maine Sugar Industries Co.,* 425 F.2d 942 (1st Cir. 1970) (decided before present Rule 102.65; in absence of formal provision for motion for reconsideration, party not barred from raising in unfair labor practice proceeding issue which could not have been raised in representation proceeding because evidence was not yet available).

■ From the language of Rule 102.-65(e)(1) and its treatment in these cases, we hold that the Bank had sufficient notice that it could contest the Board's treatment of this new issue by seeking reconsideration under the rule. Where the Bank had an opportunity and failed to use it, the Board was entitled to apply its rule and policy against relitigation.

The Bank seeks to avoid this result by arguing that a motion for reconsideration "is optional, not mandatory." The Bank cites Rule 102.65's provision that a party "may" seek reconsideration and that "A motion for reconsideration or rehearing need not be filed to exhaust administrative remedies." But the optional language in Rule 102.65(e)(1) might more reasonably be thought to serve other purposes. For example, it serves to recognize that a motion

for reconsideration need not be filed in every circumstance—as, for example, where the issue has already been raised and decided. *E. g., NLRB v. Mercy Hospitals of Sacramento,* 589 F.2d 968 (9th Cir. 1978), *cert. denied,* 440 U.S. 910, 99 S.Ct. 1221, 59 L.Ed.2d 458 (1979); *see also NLRB v. Annapolis Emergency Hospital,* 561 F.2d 524 (4th Cir. 1977). In such a case, reconsideration would be futile—if it were allowed at all in the absence of new evidence. Here, however, the merger issue had not been raised previously, and a motion for reconsideration provided the Bank with an opportunity to raise it in the representation proceeding. Under the rule against relitigation, the Board requires one who has an opportunity to raise an issue to use that opportunity or be barred from contesting the point in the later proceeding. As the motion for reconsideration was such an opportunity, the Board could penalize its disuse by declining to afford another opportunity later. *NLRB v. Sambo's Restaurant, Inc.,* 641 F.2d 794 (9th Cir. 1981) (section 10(e) bar against raising issues on appeal which could have been but were not presented to the Board applies where party failed to seek reconsideration of action by the Board *sua sponte*); *Amax Coal Co. v. NLRB,* 614 F.2d 872, 877 n.13 (3d Cir. 1980), *cert. granted,* —— U.S. ——, 101 S.Ct. 917, 66 L.Ed.2d 838 (1981) (same); *NLRB v. Allied Products,* 548 F.2d 644 (6th Cir. 1977) (same).[12]

■ The Bank argues, citing *Burns Electronic Security Services, Inc. v. NLRB,* 624 F.2d 403 (2d Cir. 1980), that the Board has acted arbitrarily in applying the rule against relitigation because the rule's purposes are not served here. We disagree. Indeed, we think this is a classic instance where the purposes are served. A cardinal purpose of the rule is to prevent delay, and delay is precisely what would have resulted

**12.** The Bank attempts to distinguish these cases by pointing out that the parties involved had failed to present their claims to the Board at all, while the Bank did raise this issue in the unfair labor practice proceeding. The relevance of these cases here, however, is not for their application of section 10e, but for their view of the significance of the motion for reconsideration: where the failure to use an opportunity to raise an issue operates to bar assertion of that issue at a later time, whether before the Board or in court, the motion for reconsideration is such an opportunity.

had the Board chosen to consider the merger issue after it had been raised at the eleventh hour in the unfair labor practice proceeding. By the time of that proceeding, a full two years had passed since the Bank's employees voted in favor of Union representation. Through a lengthy series of proceedings contesting the representative status of the Union, the Bank had managed to avoid bargaining during this period. Had the Bank raised the merger issue in December 1979, when it received the Board's decision, the issue could have been considered promptly, as adjunct to or in the context of the representation proceeding. All challenges to the Union's representation would have been settled, and bargaining could have begun.[13] Instead, the Bank remained silent until April, 1980,[14] some four months after the Board's order, when it suddenly asserted its right to contest the merger.[15]

Since the Bank failed to raise the issue in a timely manner, the Board was within its discretion in refusing to afford a hearing.[16] As the Supreme Court observed in *United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952), and as we quoted in *NLRB v. Rexall Chemical Co.*, 370 F.2d 363, 366 (1st Cir. 1967),

Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice.

*The petition for review is denied. The petition for enforcement is granted.*

13. The Bank relies on *NLRB v. Pearl Bookbinding Co., Inc.*, 517 F.2d 1108, as a case in which a union merger was contested during an unfair labor practice proceeding. There, however, the merger occurred after the union was certified, so that the employer had no opportunity to contest the merger during the representation proceeding.

14. The Board now argues that the issue was not properly raised even then, since the Bank failed to seek permission to amend its answer, as required by Rule 102.23. That rule provides that an answer may be amended without permission at any time before the hearing date, but after that date only with permission. Here, the hearing date was set for June 25, 1980. It appears, therefore, that the Bank was entitled under the Board's rules to amend its answer without permission at the time when it did so. Nevertheless, we see no abuse of discretion in the Board's refusal to hear the new issue raised in the amended answer.

15. The Board, noting the lack of any mention of the merger as a ground for refusing to bargain

in the Bank's letter to the Union, as well as the Bank's failure to move for reconsideration, termed the merger issue an "afterthought." The Bank's motives are not determinative, but the Board could consider them in exercising its discretion, and it could reasonably assume that if the Bank seriously questioned the validity of the merger and intended to resist bargaining on that ground, it would have challenged the merger immediately upon learning of it. We also note that the Bank has apparently not alleged or offered to prove facts which would show that as a result of the merger the Union is "substantially different—other than in name and affiliation—from the prior union," *NLRB v. Pearl Bookbinding Co., Inc.*, 517 F.2d at 1111, a crucial factor in determining the propriety of a union's continued certification as a bargaining representative following a merger. *Id.*, at 1112.

16. We note that the Sixth Circuit is considering, but has not decided, a similar issue in *L. M. Berry & Co. v. NLRB*, No. 80–1354.