UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT



No. 96-1945

TELEMUNDO DE PUERTO RICO, INC.,

Petitioner, Cross-Respondent,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent, Cross-Petitioner.



PETITION FOR REVIEW OF AN ORDER OF

THE NATIONAL LABOR RELATIONS BOARD



Before

Selya, Circuit Judge, 

Aldrich, Senior Circuit Judge, 

and Lynch, Circuit Judge. 



Jay A. Garc a-Gregory with whom Trist n Reyes-Gilestra and 
Fiddler, Gonzalez & Rodriguez were on brief, for petitioner. 
Ginoris Vizcarra de L pez-Lay, with whom L pez-Lay Vizcarra 
& Porro was on brief, for intervenor. 
John D. Burgoyne, Assistant General Counsel, with whom 
Frederick L. Feinstein, General Counsel, Linda Sher, Associate 
General Counsel, and Aileen A. Armstrong, Deputy Associate 
General Counsel, National Labor Relations Board, were on brief,
for respondent.



May 15, 1997


SELYA, Circuit Judge. We live in the age of SELYA, Circuit Judge. 

television, and the judicial system is not immune. This case,

however, varies the usual setting in which courts and cameras

coalesce, for our interest lies behind the television screen. In

pursuing that interest, we entertain today a question familiar to

a generation of television viewers: "Who's the Boss?"

The script for this episode features Telemundo of

Puerto Rico, Inc. (the Company), which petitions to set aside a

final order of the National Labor Relations Board (the Board)

determining that it unlawfully refused to recognize and bargain

with the Uni n de Periodistas, Artes Gr ficas Y Ramas Anexas (the

Union). The Board cross-petitions for enforcement of its order

pursuant to the National Labor Relations Act (the Act), and

specifically, 29 U.S.C. 160(e), (f) (1994). We enforce the

order.

I. SETTING THE LIGHTS I. SETTING THE LIGHTS

Telemundo operates a television station in Hato Rey,

Puerto Rico. In December of 1994, the Union (which appears in

this venue as an intervenor) sought to be certified as the

exclusive collective bargaining representative of a tiny group

of Company employees known as technical directors (TDs).

Telemundo opposed the effort, casting the three TDs as

supervisors (and, thus, part of management). Agents of the Board

conducted a representation proceeding at which evidence was

taken. The record was closed in April 1995. On January 30,

1996, the regional director issued a decision finding the TDs to

2

be run-of-the-mill employees, not supervisors, and mandating an

election (to take place on February 28, 1996) for a bargaining

unit composed solely of the three TDs.

On February 12, the Company sought reconsideration; it

filed a request for review and annexed to the papers a letter

dated May 15, 1995, in which it had informed the TDs' immediate

superior, Rafael Corps, that his position technical supervisor

(TS) was to be eliminated effective June 16, 1995. On February

28, the three TDs voted unanimously to join the Union. The Board

denied the Company's request for review two days later and

thereafter certified the Union as the bargaining unit's

representative.

It is common ground that employers cannot obtain direct

review of unfavorable certification decisions. See American 

Fed'n of Labor v. NLRB, 308 U.S. 401, 409-11 (1940). 

Consequently, if an employer is dissatisfied with the outcome of

a representation proceeding, the option of choice is to refuse to

bargain and to raise any infirmity in the certification decision

as a defense to the unfair labor practice charge that almost

inevitably will ensue. See, e.g., Boire v. Greyhound Corp., 376 

U.S. 473, 477 (1964); S.D. Warren Co. v. NLRB, 342 F.2d 814, 815 

(1st Cir. 1965). So here: the Company stonewalled, the Union

pressed an unfair labor practice charge, and the Company defended

on the ground that the bargaining unit was inappropriate because

the TDs were supervisors. As part of this defense, the Company

asked the Board to pay special heed to (1) the letter eliminating

3

the technical supervisor's position, and (2) an affidavit

executed well after the election by Elizabeth Rivera, a member of

management, purporting to describe changes in the TDs' duties.

The General Counsel moved for summary judgment. The

Board obliged, rejecting the proffered affidavit, upholding the

underlying certification, and ruling that the Company's refusal

to bargain violated the Act. See Telemundo of P.R., Inc., 321 

NLRB No. 133, slip op. (NLRB Aug. 16, 1996). These proceedings

followed apace.

II. ASSEMBLING THE CAST II. ASSEMBLING THE CAST

The employees in the bargaining unit are members of the

Company's production services department, which has the

responsibility for producing live and taped telecasts. During

the pendency of the representation proceeding, the department

comprised, inter alia, the director (Rivera), the technical 

supervisor (Corps), three program directors, three TDs, audio and

lighting persons, and eighteen studio technicians. Typically,

the TS prepared a daily schedule delineating which employees

would work on which programs and establishing a specific set of

responsibilities for three crews, each headed by a TD and

including technicians (e.g., cameramen, a floor manager or

coordinator, audio and lighting persons, a character generator

operator) assigned to the crew by the TS.

In the pre-production stage, the crew's activities are

dictated for the most part by the script for the upcoming

program. The TD is given the script, sometimes called a run-

4

down, and it is incumbent upon him to ensure that the studio is

prepared for production according to the script and that all

hands are present and in their places. When the performance

begins, a program director takes over and the TD retires to

operate the camera control panels in the control room. Some crew

members work in the control room alongside the TD; others work on

the floor.

After the performance ends, the TD again comes to the

fore; in the course of an approximately 30-minute process known

as the wrap, the TD and his crew store the equipment and other

programming paraphernalia in the control room. All three TDs,

but no studio technicians, possess keys to the control room, and,

after the equipage is stored, the TD assumes responsibility for

locking the room. The TD also prepares and files a daily report

which memorializes the crew's membership, catalogues the

equipment used during production, and relates any problems that

occurred with regard to either personnel or equipment. The

program director and the floor coordinator likewise file daily

reports.

To achieve a balanced picture, it is important to note

what TDs do not do. They ordinarily do not make disciplinary

recommendations in their daily reports; rather, the technical

supervisor reads the reports and takes whatever disciplinary

action he thinks is appropriate. The TDs neither participate in

the disciplining of errant employees nor perform employee

evaluations. They do not interview, hire, promote, demote, or

5

terminate other workers. They do not address employee

grievances.

As in any workplace, absenteeism occurs. In a TD's

absence, another TD or the TS will replace him. Technicians who

find themselves unable to work must inform the TS, who will

secure a replacement. If neither the department director nor the

TS is at the station (as frequently occurs on weekends, holidays,

and during some night shifts), a TD may be the highest-ranking

employee on the premises. As such, he will recruit needed

substitutes from another crew or from a list composed by the

technical supervisor and posted in the production office. The TS

often will "pop in" on such occasions, and, in any event, the TDs

have the home telephone numbers of both the director and the TS,

and they are under instructions to call either or both of these

individuals in case of an emergency.

The TDs have some trappings of a higher echelon. They

receive more munificent salaries, larger bonuses, and better

benefits than the studio technicians. They rate reserved parking

spaces and separate desks (albeit in a common office). They

occasionally have been invited to attend supervisors' meetings

(including a few meetings at which collective bargaining

negotiations were discussed). Sporadically, TDs have initiated

meetings among technical personnel but they do not have the

power to follow through on such initiatives unassisted. For

instance, when a TD notified Rivera of his wish to discuss

tardiness, work habits, and care of equipment with the

6

technicians in his crew, Rivera called such a meeting and the TD

ran it. On another occasion, a TD drafted (but did not send) a

memorandum requesting that technical personnel report to the

studios at the entry time set by management even if they had no

assigned work then and there. Rivera rewrote the memo for

signature by the TS and the TD, adding a reminder about the

possible consequences of noncompliance.

III. THE RATINGS III. THE RATINGS

In rating the Board's performance, we first review its

determination that the TDs are not supervisors.

A. Receiving Our Cues. A. Receiving Our Cues. 

To put this case into perspective, it bears remembering

that the Act strives to limn a clear distinction between

management and labor. To that end, supervisory employees are

excluded from the bargaining process because they must represent

the interests of their employer rather than the interests of

their coworkers. See Stop & Shop Cos. v. NLRB, 548 F.2d 17, 19 

(1st Cir. 1977). The Act defines a "supervisor" as "any

individual having authority, in the interest of the employer, to

hire, transfer, suspend, lay off, recall, promote, discharge,

assign, reward, or discipline other employees, or responsibly to

direct them, or to adjust their grievances, or effectively to

recommend such action, if in connection with the foregoing the

exercise of such authority is not of a merely routine or clerical

nature, but requires the use of independent judgment." 29 U.S.C.

152(11). Because the statute is to be read in the disjunctive,

7

any one of the enumerated powers may signify supervisory status.

See Northeast Utils. Serv. Corp. v. NLRB, 35 F.3d 621, 624 (1st 

Cir. 1994), cert. denied, 115 S. Ct. 1356 (1995); Maine Yankee 

Atomic Power Co. v. NLRB, 624 F.2d 347, 360 (1st Cir. 1980). 

Nonetheless, as the definition's final clause reflects, Congress

intended to exclude "`straw bosses,' `lead men,' and other low-

level employees having modest supervisory authority" from

supervisor status.1 NLRB v. Res-Care, Inc., 705 F.2d 1461, 1466 

(7th Cir. 1983) (quoting legislative history). Thus, even an

enumerated power must involve the exercise of independent

judgment in order to brand the holder of the power as a

supervisor.

 

1The derivation of the term "straw boss" bears mentioning:

In the early days of logging in mountainous
country straw was spread upon slopes too
steep for horses to hold back a sled load of
logs but not so steep as to require
"bridling," i.e., looping a short length of
chain around a sled runner to drag underneath
it, or holding the load back by means of a
long rope attached to the rear of the sled
and wound once or twice (snubbed) around a
stump at the top of the slope to provide
friction. After each passage, sometimes at
full gallop to keep the horses ahead of the
load, the straw was naturally displaced so a
man with a pitchfork was posted at each slope
to keep the straw evenly distributed.
Although teamsters were men of consequence in
the lumber camps, the rule was that they were
not to start down a slope until the far
humbler functionary with a pitchfork, using
his "independent judgment," passed word that
the slope was prepared. Hence the term
"straw boss."

NLRB v. Swift & Co., 292 F.2d 561, 563 n.2 (1st Cir. 1961). 

8

Given the myriad iterations of authority that are

possible and the subtle distinctions that easily can be drawn,

courts must afford great deference to the Board's expert

determination of which workers fall into which classification.

See Goldies, Inc. v. NLRB, 628 F.2d 706, 710 (1st Cir. 1980); 

Maine Yankee, 624 F.2d at 360; see also Universal Camera Corp. v. 

NLRB, 340 U.S. 474, 488 (1951) (describing the Board as an agency 

"presumably equipped or informed by experience to deal with a

specialized field of knowledge, whose findings within that field

carry the authority of an expertness which courts do not possess

and therefore must respect"). Consequently, we must accept the

Board's findings as to which employees are supervisors and which

are not unless those findings fail to derive support from

substantial evidence in the record as a whole. See Universal 

Camera, 340 U.S. at 488; Providence Hosp. v. NLRB, 93 F.3d 1012, 

1016 (1st Cir. 1996); see also 29 U.S.C. 160(e), (f). 

B. Addressing the Studio Audience. B. Addressing the Studio Audience. 

The Company contends that the Board engaged in

piecemeal analysis and ignored overwhelming record evidence

indicating that TDs responsibly direct studio technicians. After

carefully examining the entire record, we conclude that

substantial evidence supports the Board's determination that the

three TDs are ordinary employees, not supervisors.

The linchpin of this assessment is that, as the Board

pointed out, the primary responsibilities of the TDs relate to

safeguarding equipment, ensuring that the crew is positioned in

9

accordance with the script, performing actual production work,

and documenting the events (or nonevents) incident to the

production of particular programs. Although these duties carry

responsibilities greater than those borne by studio technicians,

they do not require the exercise of independent judgment in any

legally meaningful sense.

Certainly, superintending the maintenance and use of

equipment is not commonly thought to be a supervisory function or

to require managerial authority. See Maine Yankee, 624 F.2d at 

361-62. Similarly, the mere fact that an employee gives other

employees instructions from time to time does not in and of

itself render him a supervisor for purposes of the Act. See Stop 

& Shop, 548 F.2d at 19. Rather, the portent of that fact depends 

on the relative significance of the instructions given. See id.; 

see also Goldies, 628 F.2d at 710. In this situation, the TDs do 

little more than implement the instructions contained in the

program's script. Moreover, because each technician has his own

assignment and performs repetitive tasks day after day, the crew

members require minimal supervision. Viewed in the totality of

the circumstances, the TDs' orders are both perfunctory and

routine. Thus, the instructions, evaluated in context, do not

fairly indicate that the instructors possess authority to

exercise independent judgment in overseeing other employees. See 

NLRB v. Dickerson-Chapman, Inc., 964 F.2d 493, 496, 499-500 (5th 

Cir. 1992); Goldies, 628 F.2d at 710; see also Westinghouse 

Broad. Co., 216 NLRB 327, 329 (1975) (finding that television 

10

directors did not "responsibly direct" employees where the

directions they gave were routine technical commands "made

pursuant to preconceived production guidelines which ha[d] been

approved by higher authorities").

Although the fact that TDs are the highest-ranking

persons at the station on certain occasions hints at supervisory

status, that fact alone does not convert otherwise routine duties

into supervisory tasks. See Fall River Sav. Bank v. NLRB, 649 

F.2d 50, 54 (1st Cir. 1981). And, here, the additional duties

performed by the TDs on those occasions are mundane. None of

them necessitates supervisory authority for its due performance.

The technical supervisor, not the TD, is responsible for work

assignments and replacements; only when the TS is unavailable

does the TD locate substitutes, and, even then, the TD must refer

to a list of names prepared by the TS. This function 

irregular, mechanical, and devoid of independent judgment does

not constitute true authority to assign work.2 See Northeast 

Utils., 35 F.3d at 625; Highland Superstores, Inc. v. NLRB, 927 

F.2d 918, 923 (6th Cir. 1991).

Finally, filing daily reports and attending the

occasional meeting does not make a decisive difference in this

situation. See, e.g., Stop & Shop, 548 F.2d at 20; NLRB v. 

Magnesium Casting Co., 427 F.2d 114, 117 (1st Cir.), aff'd, 401 
 

2This conclusion is fortified by the fact that the
department director and the TS are on call, and the Company
provides the TDs with their home telephone numbers for use if an
emergency arises. See North Shore Weeklies, Inc., 317 NLRB 1128, 
1131 (1995); Ball Plastics Div., 228 NLRB 633, 634 (1977). 

11

U.S. 137 (1970). The reports are merely informational; the TDs

do not effectively recommend disciplinary action by completing

the forms. Thus, even though the information conveyed in these

reports sometimes may lead to the imposition of discipline, it is

not the writers who make the call. Even on those few occasions

when the TDs have submitted recommendations, their superiors have

exercised independent judgment in deciding whether (and if so,

what) disciplinary action is warranted. In these respects, then,

the TDs are mere scriveners and acting as an amanuensis or

otherwise fulfilling a purely reportorial function is not an

indicium of supervisory status. See Highland Superstores, 927 

F.2d at 922. The evidence as to meetings is also subject to

conflicting inferences. To be sure, the TDs attended a few

meetings for supervisors but many such meetings were held to

which they were not invited. And when they attempted to arrange

technicians' meetings, they were stymied unless they received the

blessing of Rivera and Corps.

We do not mean to imply that the evidence is one-sided

or that the pivotal question is free from doubt. There are

several evidentiary trails in the record, some leading toward one

destination at which the Board arrived and some leading away from

it. Some of the factors which we have discussed argue in varying

degrees for supervisory status the TDs' hegemony at certain

times, their pay level, the giving of instructions to others,

occasionally passing out work assignments, filing reports, and

attending meetings but many of them are double-edged. Just as

12

important, the Board considered the collective force of these

factors and rejected the inference hawked by the Company in favor

of a different, equally supported inference. On reflection, we

cannot say that the Board's choice was arbitrary or capricious.

In a last-ditch effort to save the show, the petitioner

flips to another channel. It urges that Maine Yankee requires 

overturning the Board's decision here. We do not agree. In

Maine Yankee, the Board decided that shift operating supervisors 

at a nuclear power plant were not statutory supervisors. We

reversed. 624 F.2d at 366. Because the shift supervisors would

have to answer for anything that went wrong with the plant's

electrical output, management held them fully accountable and

responsible for the employees' performance, and, thus, they

possessed authority responsibly to direct other employees. See 

id. at 360-61; see also NLRB v. J.K. Elecs., Inc., 592 F.2d 5, 7 

(1st Cir. 1979) (holding as supervisors group leaders who could

lose their positions if employees in their group failed to meet

production quotas). Here, however, the record contains no

compelling evidence that a TD is held accountable for the

adequate performance of the crew's technical work. This

distinction makes a world of difference. See Northeast Utils., 

35 F.3d at 625 (distinguishing Maine Yankee in excluding from 

supervisory status coordinators who were not responsible for the

actions of other employees).

The Company also claims that Maine Yankee bears upon 

the question of whether TDs perforce exercise independent

13

judgment because they cannot always reach the department director

or the technical supervisor by telephone for emergency

consultation. But Maine Yankee reflects a vastly different plot. 

In that case, the panel emphasized the complexity, variety, and

dangerousness of operational duties at an atomic power plant, 624

F.2d at 361 & n.14, 363, and distinguished a shift supervisor

there who had to initiate remedial measures quickly whether or

not he could reach his superiors from "a dispatcher who assigns

employees and equipment according to a relatively simple pre-

programmed plan" developed by the employer, id. at 363. There is 

no evidence in the instant record of comparable complexity or

dangerousness, nor is there evidence that a TD may have to make

emergency decisions on hazardous or even intricate matters.

Indeed, the only relevant proof relates to decisions such as

whether to proceed with two cameras instead of three if a

cameraman is missing. Under these circumstances, we cannot fault

the Board's conclusion that the TDs act more as dispatchers,

performing routine tasks and conveying boilerplate instructions,

than as supervisors. And, moreover, the Board's conclusion is

wholly consistent with the TDs' stated self-perception that they

are crew leaders, no more.

To conclude, there is a fine line between the upper

strata of employees and the lowest rungs of the management

ladder. We freely acknowledge that the Board, had it chosen to

weight the TDs' responsibilities differently, could have reached

the opposite result. The question is admittedly close, yet its

14

very closeness argues persuasively in favor of deference to the

Board. It is particularly in the close cases that judges, who

are generalists, should respect the specialized knowledge of the

Board and accede to its factbound determinations as long as they

are rooted in the record. See Universal Camera, 340 U.S. at 488. 

Put bluntly, courts must be careful not to substitute their

judgments for the Board's where, on whole-record review, the

evidence supports any of several views and the Board has chosen

among them. See NLRB v. Auciello Iron Works, Inc., 980 F.2d 804, 

808 (1st Cir. 1992); Stop & Shop, 548 F.2d at 20. 

IV. THE LATE SHOW IV. THE LATE SHOW

As a fallback position, the Company implores us to

remand the case for reconsideration in light of newly submitted

evidence which it says signifies expanded responsibilities for

the TDs. The Company's request hinges on the import of

circumstances that allegedly have arisen since the conclusion of

the representation hearing: the elimination of the technical

supervisor's position, the ostensible transfer of some of his

duties to the TDs, and the inclusion of the TDs as members of a

fledgling evaluation committee. This initiative squarely

presents the question of when changes in employment

responsibilities require reexamination of an earlier

determination of employee status.

A. Reshooting the Scene. A. Reshooting the Scene. 

It is well settled that an employer defending against

15

an unfair labor practice charge cannot relitigate issues which

were (or could have been) contested in the underlying

representation proceeding. See 29 C.F.R. 102.65(e)(1), 

102.67(f); see also Pittsburgh Plate Glass Co. v. NLRB, 313 U.S. 

146, 162 (1941); Fall River Sav. Bank, 649 F.2d at 58. There is 

an exception to this salutary rule for extraordinary

circumstances, usually embodying the emergence of evidence

previously undiscovered (or, at least, unavailable). See 29 

C.F.R. 102.65(e)(1);3 see also Fall River Sav. Bank, 649 F.2d 

at 58; East Mich. Care Corp., 246 NLRB 458, 459 (1979), enforced 

without opinion, 655 F.2d 721 (6th Cir. 1981). But this 

exception should be invoked sparingly, and a court should

hesitate to second-guess the Board's assessment that particular

circumstances do not qualify for it.

B. Switching Stations. B. Switching Stations. 

The proffered evidence is of two types. We treat each

type separately.

 

3The applicable agency rule provides in pertinent part:

A party to a proceeding may, because of
extraordinary circumstances, move after the
close of the hearing for reopening of the
record, or move after the decision or report
for reconsideration, for rehearing, or to
reopen the record . . . . Only newly
discovered evidence evidence which has
become available only since the close of the
hearing or evidence which the regional
director or the Board believes should have
been taken at the hearing will be taken at
any further hearing.

29 C.F.R. 102.65(e)(1).

16

1. The evidence concerning the elimination of Corps' 1.

position as technical supervisor the May 15 letter requires

scant comment. This letter had been submitted as an attachment

to the request for review filed in the wake of the regional

director's adverse decision in the representation proceeding.

Because a request for review "may not raise any issue or allege

any facts not timely presented to the regional director," 29

C.F.R. 102.67(d), the submission of the letter imposed no

obligation on the Board to consider the implications of Corps'

termination, especially in the absence of a motion to reopen the

record. See generally East Mich. Care, 246 NLRB at 459 (dictum). 

Beyond that pitfall, a second obstacle looms. The

Board, in its own phrase, "fully considered" the May 15 letter.

Telemundo, slip op. at 1 n.1. We think it would be curious to 

remand a case for consideration of evidence that an agency

already has fully considered, and we will not do so here.4

2. The more nettlesome question relates to the claim 2.

that the TDs had been vested with some managerial duties formerly

handled by the technical supervisor and had been assigned added

responsibility for evaluating other employees. The Board's first

notice of these alleged innovations came on July 16, 1996 (after 

the bargaining unit had been certified), when the Company

 

4Moreover, we readily appreciate the Board's refusal to
attach decretory significance to the epistle. The letter states
only that the Company had decided to eliminate the position of
technical supervisor. It furnishes no indication that this
position elimination might alter or affect the scope of the
technical directors' duties.

17

submitted, as part of its reply to the unfair labor practice

charge, an affidavit executed on May 9 by Elizabeth Rivera, the

department director. The Rivera affidavit claimed, for the first

time, that "some administrative duties that were performed by the

Technical Supervisor, such as the preparation of the daily

schedules and the revision and approval of the weekly payroll,

are now performed by the Technical Directors." The affidavit

also disclosed that in March 1996 the Company had created a

committee to evaluate the technicians' work and made the TDs

members of it (thus enhancing their supervisory roles).

Assuming arguendo the truth of the Company's 

description of these augmented duties, the timing gives us pause.

While Rivera's affidavit is strangely silent as to when the

changes transpired its text states only that the TDs assumed

the additional duties; it does not broadcast the time frame in

which the Company made the reallocation it is transparently

clear that the attempted expansion of the TDs' job description

took place at some time after the record had closed in the

representation proceeding. Thus, those changes, no matter when

thereafter they were effectuated, do not constitute evidence that

can vitiate the Board's determination of the propriety of the

bargaining unit. It follows that the Board acted well within its

lawful authority in refusing to entertain the proffer.

If an employer could insist that evidence of this kind

be considered by a reviewing tribunal (be it court or agency)

after the administrative record had been closed, then the

18

employer routinely could defease a bargaining unit despite the

fact that the Board had determined it to be appropriate. Indeed,

doing so would require no greater effort than modifying the

affected employees' duties. Such a regime would be antithetical

not only to the Board's regulations but also to precedent,

policy, and the objectives of the Act.

The regulatory scheme is explicit; the Board determines

the appropriateness of a bargaining unit based upon the

conditions of employment as they exist at the time of the

hearing, and, at least in the absence of extraordinary

circumstances,5 the record thereafter may be augmented only by

newly discovered evidence. See 29 C.F.R. 102.65(e)(1). This 

regulation limits the rubric "newly discovered evidence" to

"evidence which has become available only since the close of the

hearing, or evidence which the regional director or the Board

believes should have been taken at the hearing." Id. This 

definition effectively demarcates the representation proceeding

as the outermost point in time to which evidence can relate.

Facts which arise only after the hearing has been concluded and 

the record closed are irrelevant, whereas facts which are not

discovered until then (but which relate to the time frame at 

 

5We reject out of hand the Company's argument that the
change in duties here constitutes extraordinary circumstances
requiring the Board to reexamine the appropriateness of the
bargaining unit. If an employer, dissatisfied with the upshot of
a representation proceeding, could manufacture circumstances
sufficient to require reconsideration simply by shifting duties
around, then Board certifications would be little more than
hollow gestures.

19

issue in the hearing) are potentially relevant and may be

considered in the Board's discretion.

Precedent fully supports the general proposition that

unilateral changes to employment parameters occurring after a

representation hearing has been completed can have no bearing

upon the outcome of that proceeding. See K-Mart, 322 NLRB No. 

98, slip op. at 1 (NLRB Nov. 22, 1996) ("If the change was the

result of unilateral actions by the Respondent, it would normally

not be a basis for reconsidering the certification . . . ."),

petition for review pending (D.C. Cir., No. 96-1461); East Mich. 

Care, 246 NLRB at 459 (holding that evidence of subsequent 

changes made in the duties of unit employees lacked relevance

because the evidence "d[id] not involve facts which existed at

the time of the hearing in the underlying proceeding and,

therefore, d[id] not constitute newly discovered and previously

unavailable evidence").

This proposition also comports with sound policy and

core purposes of the Act. Affording an employer (or a labor

union, for that matter) unilateral control over critical aspects

of the collective bargaining process would dislodge the balance

and weaken the structure of the collective bargaining framework.

See Auciello Iron Works, Inc. v. NLRB, 116 S. Ct. 1754, 1758-60 

(1996). What is more, enforcing this policy furthers the broad

objective of restoring the equality of bargaining power between

employers and employees that is so central to the Act, while

simultaneously securing stability in labor relations. See id. at 

20

1759; see also 29 U.S.C. 151. 

Of course, the closing of the record in a

representation proceeding does not freeze the duties of the

members of the proposed bargaining unit for all time and in all

circumstances. When the motion to reopen is premised on

subsequently conferred duties, the Board is warranted in

presuming that such duties are irrelevant to its conclusion. An

employer who seeks to overcome that presumption bears a heavy

burden of showing that a legitimate business necessity arising

out of circumstances that were in play before the representation

proceeding concluded forced him to recast job descriptions. See, 

e.g., Frito Lay, Inc., 177 NLRB 820, 821 (1969) (vacating a 

certification after ensuring that changes in duties were effected

pursuant to "legitimate business purposes, and without intent to

evade the Respondent's obligation under the certification").6

We need not tarry. The Company has presented no

evidence that either the shifting of the technical supervisor's

duties or the creation of the evaluation committee resulted from

events set in motion prior to, and independent of, the

 

6In Frito Lay, the Board dismissed an unfair labor practice 
complaint, finding that subsequent changes attributable to the
company's nationwide reorganization eliminated the "essential
factor" which made the previously certified unit appropriate.
820 NLRB at 821. As was repeatedly underscored in the decision,
the employer undertook this reorganization as a result of the
recommendations provided by a management consultant which had
begun a study of the employer's operations before the union 
instituted the representation proceeding. The timing enabled the
Board to find that the "restructuring was clearly not for the
purpose of avoiding compliance with the Board's unit finding."
Id. Telemundo has sketched no comparable story line. 

21

representation proceeding. Thus, the evidence contained in

Rivera's affidavit falls well outside the compass of relevance

and cannot justify a remand for the purpose of relitigating the

issue of supervisory status.

There is, moreover, another basis for sustaining the

Board's order in the face of the Company's proffer. As we

previously mentioned, the evidence is cloudy as to exactly when

Telemundo first purposed to augment the TDs' responsibilities.

See supra p. 17-18. It is, however, pellucid that the TDs were 

not assigned to positions on the evaluation committee until March

1996 at the earliest. By that time, any proposed change in 

duties that would convert unit employees to statutory supervisory

status (and thereby eliminate the bargaining unit) had become a

mandatory subject of collective bargaining. See East Mich. Care, 

246 NLRB at 459-60 & n.4; Highland Terrace Convalescent Ctr., 233 

NLRB 87, 88 (1977); Kendall College, 228 NLRB 1083, 1087-89 

(1977), enforced, 570 F.2d 216 (7th Cir. 1978); see also 29 

U.S.C. 158(d) (designating as mandatory bargaining subjects

wages, hours, and "other terms and conditions of employment").

Because the change in duties that Telemundo attempted here was

done unilaterally and, in the Company's own words, "should carry

the day" in its quest to incorporate the TDs into management, the

change transgressed the obligation to bargain collectively.

Therefore, rather than constituting evidence of

misclassification, the new assignment constitutes further

evidence of an unlawful refusal to bargain. See, e.g., NLRB v. 

22

Westinghouse Broad. & Cable, Inc., 849 F.2d 15, 20, 22 (1st Cir. 

1988); East Mich. Care, 246 NLRB at 459-50 & n.4.7 

V. THE WRAP V. THE WRAP

We need go no further. The Board's determination that

the TDs are employees, not supervisors, is supported by

substantial evidence on the record as a whole. Moreover, the

Board did not err in holding its ground notwithstanding the

unilateral changes that the Company made in the TDs' duties after

the record in the representation proceeding had been closed.

The petition for review is denied, the cross-petition The petition for review is denied, the cross-petition 

is granted, and the Board's order is enforced. is granted, and the Board's order is enforced. 

 

7To be sure, there is an exception to this longstanding rule
in cases where compelling economic considerations are present.
See Westinghouse, 849 F.2d at 20. The exception is of no 
consequence here, however, as the Company does not rely upon it
and the record does not disclose any facts that would support its
invocation.

23