# United States Court of Appeals
## For the First Circuit

---

No. 00-1268
   00-1558

NATIONAL LABOR RELATIONS BOARD,

Petitioner/Respondent, Cross-Petitioner

v.

REGIONAL HOME CARE SERVICES, INC., D/B/A/
NORTH ATLANTIC MEDICAL SERVICES,

Respondent/Petitioner, Cross-Respondent.

---

APPLICATION FOR ENFORCEMENT, PETITION FOR REVIEW,
AND CROSS-APPLICATION FOR ENFORCEMENT OF ORDERS OF
THE NATIONAL LABOR RELATIONS BOARD

---

Before

Stahl, Lynch, and Lipez, <u>Circuit Judges</u>.

---

Richard A. Cohen, Senior Attorney, National Labor Relations Board, with whom Leonard R. Page, General Counsel, National Labor Relations Board, and Aileen A. Armstrong, Deputy Associate General Counsel, National Labor Relations Board, were on brief, for Petitioner. Kevin M. Keating for Respondent.

January 23, 2001

**LYNCH, <u>Circuit Judge</u>**.  In 1995 the Teamsters Union began an organizing campaign at North Atlantic Medical Services, a supplier of medical equipment.  North Atlantic fought fiercely and also unfairly and now has unfair labor practice findings against it, as well as a bargaining order.  A supervisor, though, had pro-union sympathies which he openly expressed.  The employees -- that is, a majority of them -- both signed union representation cards and voted for unionization in an election.  The employer has refused to bargain with the Union and twice has been ordered by the National Labor Relations Board to do so.  The Board now petitions for enforcement of its various orders.  North Atlantic also petitions for review, saying that both the election and the authorization cards, and thus the consequent Board orders to bargain, must be set aside because the supervisor's conduct biased the outcome.  North Atlantic has not challenged the finding of unfair labor practices on its part.  The case involves review of the Board's determination that the pro-union activities of a supervisor were not sufficient to deprive employees of their right to a free and uncoerced choice, and thus to set aside the two bases for the bargaining order.

**I.**

We summarize the Administrative Law Judge's undisputed findings of fact, adopted by the Board.

North Atlantic Medical Services supplies medical equipment. That equipment is delivered by field service technicians, or drivers. In April 1995, when union organizing efforts began, North Atlantic employed approximately eleven drivers and mechanics at its Leominster facility.

At the request of driver Marco Nagle, union organizer Al Stearns met on April 6, 1995, with Nagle and four other North Atlantic employees who were interested in unionization.[1] Field Service Manager Steven Custer also attended the meeting. Custer said he supported unionization but told the others that North Atlantic's president, Carbot Carabott, was adamantly opposed to unionization and had once threatened to "lock the [ ] doors" if the employees tried to organize a union. Custer warned that Carabott would "do everything in his power to make it miserable for everyone" if they tried to organize. All six attendees,

_____

[1] Stearns represented the International Brotherhood of Teamsters, AFL-CIO. We refer to the local, Truck Drivers Union Local 3170, as "the Union," either as the proposed representative or as the certified representative of North Atlantic's drivers.

-4-

including Custer, signed union authorization cards at that meeting. Custer did not himself pass out cards or ask employees to sign the cards, nor did he promise rewards if they supported unionization or punishment if they did not.

Shortly after the meeting, Nagle obtained signed cards from three more employees. When Stearns again met with employees on April 13, eight of the eleven unit members had signed cards. Stearns filed a representation petition with the Board. The Board then sent a copy to North Atlantic on April 17. The parties agreed to an election set for June 1, 1995.

In the weeks before the election, North Atlantic launched a campaign to defeat unionization. It undertook a series of personnel actions designed to undermine support for unionization in the bargaining unit. Three days after receiving the petition, on April 20, North Atlantic removed Gary Roy, a union supporter who had signed an authorization card on April 6, from a light duty assignment and placed him on full worker's compensation pending further investigation of his condition. North Atlantic fired Roy a month later on May 22. Also on May 22, North Atlantic laid off another driver in the unit, Marc Kiroac, for "lack of work," although Kiroac had worked over 60

hours in each of the previous two weeks, and was recalled one week after the election. And on April 21, North Atlantic transferred a salesman, Michael McDermott, a union opponent, back into the bargaining unit as a driver in order to dilute support for unionization. McDermott did not want to transfer and told other drivers that he was eager for the election to be over so he could go back to his sales job.

President Carabott held two mandatory employee meetings to discuss his opposition to unionization. At the meetings, Carabott questioned employees directly about their reasons for supporting unionization, and told them they could work down the street if they wanted a union. He also said that he would get out of the business when it stopped being "fun," and spoke about a friend's company that went out of business after employees chose unionization. This was an implied threat that North Atlantic would go out of business if the drivers won representation rights. Calling the unionization effort a "battle in a war," Carabott said that he would not lose this war. He warned that unionization would be futile because there would be no extra benefits even if the employees chose union representation, and that although a union could offer anything,

he had the final say as to what would be given. Carabott also announced a new "open door policy" and solicited grievances from employees, and implied that he would suspend that policy if employees unionized.

North Atlantic also distributed two anti-union memoranda to employees shortly before the June 1 election. In the second memo, which accompanied paychecks, Carabott wrote that unionization could "endanger the financial stability of this company and also the livelihood that enables you to provide for your family" because customers would be unlikely to continue to do business with a unionized company due to the threat of strikes. Carabott also warned that a strike "means loss of business and loss of jobs."

Meanwhile, on April 20, three days after it received the representation petition, North Atlantic fired Field Service Manager Custer, purportedly for failing to competently perform his responsibilities as service manager. The Union filed a discriminatory discharge charge on Custer's behalf on May 22.[2] The Union argued that Custer was an employee, fired in

_____

[2] That charge was still pending at the time of the election.

-7-

retaliation for his support of unionization.  Custer attended four more union meetings before the June 1 election, but did not pressure employees to support unionization.  He asked some employees in general terms whether they planned to vote for the Union, and told them that they should only do so if they were "110 percent sure" because President Carabott would fiercely resist unionization.  Custer also voted in the June 1 election.[3]

After the election, the Board held a hearing to resolve challenges to several of the ballots.  The Board rejected North Atlantic's challenge to the Union's majority status based on Custer's pro-union activities.  Further, the Board found that North Atlantic committed numerous unfair labor practices, including firing several employees in retaliation for their union support, making unilateral changes to evaluation and compensation policies, threatening employees with job loss, and telling employees that unionization was futile because having a union would not result in improved benefits.

---

[3]     On July 22, Custer's discriminatory discharge claim was dismissed after a finding that Custer was a supervisor, not an employee, and therefore was not protected by the Act from discharge.  That decision was not appealed.

In light of North Atlantic's unfair labor practices, the Board concluded that a remedial bargaining order was warranted, requiring North Atlantic to recognize and bargain with the Union.

The Board ordered North Atlantic to cease and desist from the unfair labor practices and from interfering with or coercing employees in the exercise of their rights under the Act. North Atlantic was also required to offer reinstatement to the fired employees and to compensate all employees for losses caused by its unfair labor practices. Finally, the Board ruled that the remaining valid ballots were to be counted and, if the Union received a majority of the valid ballots, directed the Regional Director to certify the Union as the employees' exclusive bargaining representative.[4] The Board ordered the Regional Director to set aside the election if the Union did not receive a majority of the ballots cast.

The Union was certified after a revised tally revealed that the Union indeed had won the election, by a count of eight

---

[4] The record does not reveal the reason for the seeming anomaly of a bargaining order followed by an order to count ballots. It may be that the Board was simply providing alternative grounds, should one prove infirm on judicial review.

-9-

to two.  But North Atlantic again refused the Union's request for recognition and bargaining, claiming that the Union had been improperly certified because Custer's pro-union activities tainted the election, requiring it to be set aside.  Acting on a Union complaint, the Board's General Counsel issued an unfair labor practice complaint and the Board granted its motion for summary judgment against North Atlantic.  The Board found that North Atlantic had not produced any new evidence or special circumstances requiring the Board to alter its earlier decision that Custer's activities did not taint the representation proceedings.  The Board concluded that North Atlantic's refusal to bargain with the Union violated the Act and again ordered North Atlantic to bargain with the Union and to cease and desist from interfering with, restraining, or coercing employees in the exercise of their rights under the Act.

In its petition for enforcement, the Board seeks summary affirmance of its findings that North Atlantic committed several unfair labor practices, which North Atlantic does not challenge on appeal.  Further, the Board seeks affirmance of its finding that the Union achieved a valid card majority which, combined with the numerous unfair labor practices, led the Board

-10-

to certify the Union as the exclusive bargaining representative;
that certification formed the basis of the Board's remedial
bargaining order and refusal to bargain unfair labor practices
finding in 1995. The Board also requests affirmance of its
finding that North Atlantic violated the Act by refusing to
bargain with the Union after it won the election and was again
certified as the exclusive bargaining agent in 1999. North
Atlantic seeks review of the Board's orders.

## II.

The ultimate issue here is whether North Atlantic has
an obligation to bargain with the Union, as ordered by the
Board. There are two bases for the Board's bargaining orders.
First, there is a <u>Gissel</u> bargaining order, which provides a
basis for a bargaining order irrespective of the outcome of the
election because the Board found North Atlantic had committed
massive unfair labor practices, sufficient to render a fair
election improbable, and the Union had obtained an authorization
card majority. <u>See</u> <u>NLRB</u> v. <u>Gissel Packaging Co.</u>, 395 U.S. 575, 600,
610, 613 (1969) (Board can impose bargaining obligation on employer
which refuses to recognize union that has obtained card majority and
commits unfair labor practices "likely to destroy the union's majority

and seriously impede the election"). Second, an election was held and the Union won, and so that is another basis for the obligation to bargain. See NLRB v. Horizon Air Servs., Inc., 761 F.2d 22, 28 (1st Cir. 1985). North Atlantic seeks to undermine both of these grounds for the bargaining orders with the same argument: the pro-union activities of the supervisor constituted a threat, albeit indirect, to employees that if they did not vote for the union there would be consequences, and so it cannot be said there was a fair and free choice made. Because the parties have done so, we treat the analysis of the two grounds as the same; any variations are not material for resolution of the issue.[5]

Normally in representation cases, our review of the NLRB determinations is for abuse of discretion. Fall River Sav. Bank v. NLRB, 649 F.2d 50, 56 (1st Cir. 1981). The Board has "broad discretion to determine whether the circumstances of an election have allowed the employees to exercise free choice in deciding whether to be represented by a union," Comcast

_____

[5]    For example, there is no claim here that the supervisor solicited union authorization cards. Cf. NLRB v. WKRG-TV, Inc., 470 F.2d 1302, 1313-15 (5th Cir. 1973).

Cablevision-Taylor v. NLRB, 232 F.3d 490, 494 (6th Cir. 2000) (citations omitted), and we take the Board's findings of fact to be "conclusive if supported by substantial evidence on the record considered as a whole," Visiting Nurse Servs. of Western Mass., Inc. v. NLRB, 177 F.3d 52, 56 (1st Cir. 1999) (citations omitted), cert. denied, 528 U.S. 1074 (2000). However, discretion is abused if an incorrect legal standard is used. See Soto v. Flores, 103 F.3d 1056, 1063 (1st Cir.) (district court abuses discretion when it makes error of law), cert. denied, 522 U.S. 819 (1997). North Atlantic fashions its argument in this raiment, urging us to adopt the standards used by the Ninth Circuit in NLRB v. Island Film Processing Co., 784 F.2d 1446 (9th Cir. 1986), standards which it views as making it easier to show that the supervisor's activities amounted to implicit coercion, even when not overt. The Board resists and says the Island Films view is an outlier, and is inconsistent with First Circuit precedent. Our review of the Board's conclusions of law is de novo. Visiting Nurse Servs., 177 F.3d at 56.

Both an organizing campaign and an election involve the balancing of First Amendment freedoms of expression against the need to prevent coercion of employees, and the balance is meant

-13-

to preserve the employees' ability to make a free choice. The First Amendment protections concerned Congress when it enacted the National Labor Relations Act, and so it provided in 29 U.S.C. § 158(c):

> The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.

The Board tells us it has attempted to be even-handed in its application of the rules imposing consequences for certain speech, recognizing that neither the employer nor the union side may alter the balance in an election by threats of reprisal or promises of benefits. And the Supreme Court tells us that Congress intended the Board to have a wide degree of discretion "in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." NLRB v. A.J. Tower Co., 329 US 324, 330 (1946). The Board's discretion is not unlimited and the Supreme Court has reversed it where it has violated the basic principle that "[a]ny procedure requiring a 'fair'

-14-

election must honor the right of those who oppose a union as well as those who favor it. The Act is wholly neutral when it comes to that basic choice." NLRB v. Savair Mfg. Co., 414 U.S. 270, 278 (1973).

Under the Board's rules, a party may bring a challenge to election results before the Board "only where compelling reasons exist therefor," including grounds that a "substantial question of law or policy is raised" not governed by Board precedent or that there was a prejudicial error. See 29 C.F.R. § 102.67(c). But a party cannot seek direct court review of the Board's certification decisions; it can only challenge certification in the context of a refusal to bargain unfair labor practice charge. See NLRB v. S. Prawer & Co., 584 F.2d 1099, 1101 (1st Cir. 1978). The side claiming taint of an election, or any unfairness that warrants the election being set aside, bears the burden of proof on the issue. See Comcast Cablevision, 232 F.3d at 494 (party seeking to overturn election "bears the burden of showing that the election was not conducted fairly") (internal quotation marks omitted); cf. NLRB v. Dobbs House, Inc., 613 F.2d 1254, 1256 (5th Cir. 1980) (courts have added as an "additional requirement" that burden is on party

seeking Board review of election to "present specific evidence which prima facie would warrant setting aside the election") (internal quotation marks omitted). Bearing in mind that a party seeking to set aside an election bears a "heavy burden" of demonstrating that the Board abused its discretion, Melrose-Wakefield Hosp. Ass'n v. NLRB, 615 F.2d 563, 566 (1st Cir. 1980), we review the Board's decision that the supervisor's involvement did not interfere with employee free choice here.

The role of a supervisor attempting to help the union organize his workplace might be thought a bit odd, and here, as is often true, there was a dispute about whether the supervisor was really a supervisor or was an employee. See, e.g., Wright Memorial Hosp. v. NLRB, 771 F.2d 400 (8th Cir. 1985); NLRB v. Northeastern Univ., 707 F.2d 15 (1st Cir. 1983). Here, the Board ruled that the individual was a supervisor. A pro-union supervisor presents two possible scenarios which could interfere with a fair and free election. The first is confusion; the second is coercion. There may be confusion felt by employees about the message from management if one of management's own, a supervisor, urges the union upon employees. Or there may be a second effect, that a supervisor may

-16-

explicitly or implicitly coerce employees into voting for the union.  See Fall River Sav. Bank, 649 F.2d at 56 (employees might support union "out of fear of retaliation" by pro-union supervisor).

This case does not raise the first concern.  The employer left no one in doubt of its anti-union position, as the uncontested findings of unfair labor practices against it attest.  Indeed, supervisor Custer, in his debut on this issue, warned other employees that North Atlantic president was virulently anti-union.  Accord Catholic Med. Ctr. v. NLRB, 620 F.2d 20, 22 (2d Cir. 1980) (supervisor's support of union posed no risk of confusion about employer's position in view of its "vigorous campaign against the Union").

And so we turn to the second concern: whether there has been explicit or implicit coercion.  While this Circuit has not had an abundance of these cases, the few existing decisions establish the principle that "without evidence of any threats, express or implied, [the fact that supervisors favor a union ] does not compel a finding of coercion."  Fall River Sav. Bank, 649 F.2d at 57, quoted in Northeastern Univ., 707 F.2d at 18. Both sides make rather too much of this statement, since it pertains only to whether such evidence alone would compel a

-17-

finding of coercion, contrary to the Board's conclusion that there was no coercion. It is, for example, equally true that the fact that the employer opposes a union does not compel a finding of coercion. That is different from the question of whether the Board could find implicit coercion from the fact that a strong supervisor was pro-union. It is also very different from the question that concerns us: whether the Board's finding is supportable that a pro-union supervisor, by his conduct and his speech, did not invalidate free choice. But there is an important point: when the factual predicates for the Board's decisions are attacked, they may not be set aside unless the record compels a different conclusion, and so it can be said that the decision is not supported by "substantial evidence." NLRB v. Hosp. San Pablo, Inc., 207 F.3d 67, 70 (1st Cir. 2000) (court must accept Board's factual findings "unless those findings are not supported by substantial evidence on the record considered as a whole") (internal quotation marks and citations omitted). We evaluate the Board's finding by examination of certain factors set forth in Board and court cases involving claims of coercion or reward by pro-union supervisors.

The initial focus is on whether there were coercive actions by the supervisor against anti-union employees, actions such as discharge, surveillance, coercive investigation, or rewards. Similarly, courts focus on whether there were words that amounted to an express threat or promise of reward. See Gissel, 395 U.S. at 615. This case involves none of these. Cf. Comcast Cablevision, 232 F.3d at 495 (reversing NLRB and invalidating election where union offered employees free weekend trip at the union's expense).

Instead, this case involves the more subtle question of whether the conduct and speech of the supervisor amounted to implicit threats or coercion. The Board has generally considered the specific facts and circumstances and looked to three areas of inquiry: the nature of the supervisory authority, the nature of the activity and speech of the supervisor, and the context in which the supervisor acted.

The first line of inquiry looks to the scope of the supervisor's role over the employees to determine whether the supervisor has the actual ability to harm the interests of the employees or to reward them. See Fall River Sav. Bank, 649 F.2d at 57 (Board relied on limited power of branch managers to

-19-

retaliate against tellers in finding no coercion); cf. Harborside Healthcare, Inc. v. NLRB, 230 F.3d 206, 210-11 (6th Cir. 2000) (analyzing nature of supervisory authority to determine whether effect of charge nurse's conduct was coercive). There is nothing unreasonable about such an inquiry; indeed, an immediate low-level supervisor may have much more actual power to coerce or to reward than someone with a higher title in the corporate totem pole. This line of inquiry generally involves questions about the role of the supervisor in hiring, firing, wages, promotions, and other job benefits. Here, the Administrative Law Judge made exactly this inquiry, albeit on the question of whether Custer was a supervisor at all, and concluded that Custer "had the authority to effectively recommend personnel actions with respect to raises, hiring, discipline and overtime and he responsibly directed employees in at least some respects."

The period of time that this supervisory authority existed is also relevant. The ALJ noted that Custer was terminated by North Atlantic early in the organizing campaign. Although Custer continued to attend union meetings, he no longer had workplace authority. The ALJ acknowledged that this fact

-20-

alone was not dispositive in the Union's favor, given the precedent of NLRB v. Howard Johnson Motor Lodge, 705 F.2d 932 (7th Cir. 1983). There, a hearing was held on claims of taint resulting from the pro-union activity by a supervisor who was fired. Unlike here, there was a reasonable chance the supervisor would be returned to her position as a supervisor, thus raising the possibility of coercion. Here, there was, to quote the ALJ, "no realistic possibility" of such coercion because the Union's claim that Custer had been wrongly fired depended on Custer being characterized as an employee and not as a supervisor. If Custer had been returned to work as a result of the Union's filing of an unfair labor practice charge, his position would have been as an employee, not a supervisor.[6]

The second area of inquiry has to do with a very fact-intensive examination of the activities and speech of the supervisor. The ALJ found that Custer's pro-union activity was very limited: he attended union meetings, but when he spoke, it

---

[6] It is theoretically possible, of course, that other employees might nonetheless perceive him, despite his being characterized by the ALJ as an employee, to have some sort of supervisory power over them. This case, as the facts described later show, does not raise any such issue of perceived authority.

was mostly to say that the employees would have a tough time getting a union given the attitude of North Atlantic president. Custer's most explicit statements of union support came, not surprisingly, after he had been fired. He had no supervisory authority then. The ALJ also noted the lack of certain evidence. There was no evidence, for example, that Custer passed out or collected authorization cards, campaigned for the Union while he was a supervisor, or made promises or engaged in any form of coercion to further his pro-union views. And there was no evidence from which it could be reasonably inferred that other employees felt Custer was trying to force them to support the Union.

On this last point, there is an evidentiary refinement. The Supreme Court in Gissel cautioned against after-the-fact evidence from employees as to whether they had felt coerced in any way, noting that even that testimony could be subject to coercion. See 395 U.S. at 608 (employee's testimony about subjective perception of coercion may be unreliable due to employee's desire to curry favor with employer). We understand the ALJ to have kept this principle in mind and to be referring to other evidence from which such coercion could be inferred. But despite the

caution in Gissel, it is also clear that on the question of whether someone is a supervisor, the perceptions of other employees may be taken into account. See Fall River Sav. Bank, 649 F.2d at 57 n.7 (relying on employees' testimony in determining lack of threat); cf. Int'l Assoc. of Machinists v. NLRB, 311 U.S. 72, 79-80 (1940) (acts of perceived supervisors are to be accorded same weight as acts of actual supervisors if acting as agents of employer in election cases). Since many of these cases involve both questions -- supervisory coercion and supervisory status -- there is no bright line evidentiary rule permitting or excluding such evidence per se. Cf. NLRB v. Chicago Metallic Corp., 794 F.2d 527, 531 (9th Cir. 1986) (appropriate in "borderline cases" to consider whether person is perceived as a supervisor).

Finally, there is an examination of context. As the ALJ found, North Atlantic had itself engaged in coercion and discrimination in an effort to stop the Union. In this context, "the employees could not possibly believe . . . that they had anything to fear by offending Custer and opposing the Union." Again, there was no suggestion that this fact of North Atlantic's strong anti-unionism was dispositive. It may well be

-23-

that a supervisor could engage in pro-union coercion even while the company is virulently anti-union. See WKRG-TV, 470 F.2d at 1315, n.8 ("[R]easonable fear of supervisory retaliation can be present even if the company hierarchy has openly opposed the union.").

Viewing all the facts, the Board concluded there was no conduct or speech by supervisor Custer that would give rise to an inference of coercion, and therefore no basis to invalidate either the authorization cards or the election. The Board's determination of whether a supervisor's conduct tainted an election is "essentially a matter of drawing inferences, and it has long been settled that an agency's conclusions based upon such inferences should not be set aside by a reviewing court unless they transgress the bounds of reason." Catholic Med. Ctr., 620 F.2d at 22. Here, the Board's conclusion is reasonable and very far from an abuse of discretion.

North Atlantic attacks this conclusion by saying that it has been held to too high a standard of proof. All it needs to show, it says, relying on the Ninth Circuit decision in Island Film, is that the pro-union supervisory activity would "reasonably tend" to have a coercive effect, and does not need

-24-

to show actual proof of coercion. It also says that in most of these sorts of cases, where management loses, management is aware of what its wayward supervisors are doing and does nothing in response. See NLRB v. Lamar Electric Membership Corp., 362 F.2d 505, 506-07 (5th Cir. 1966) ("[W]here the employer knows of the advocacy and takes no steps to dissipate its effect, such advocacy may not be used as

a basis for setting aside the election."); see also Fall River Sav. Bank, 649 F.2d at 56 n.5 (employer who fails to exercise authority over known pro-union activities by supervisor "may not later be heard to complain of the results of its inaction"). North Atlantic should not be put in that category, it says, because it did not know what Custer was doing until the day of the election. More than that, it says, North Atlantic should prevail because it had no opportunity to respond to what Custer was doing. The harm Custer did, North Atlantic argues, is magnified because the bargaining unit was very small and only a few votes would make a difference in the outcome.

There are three difficulties with North Atlantic's argument. First, it makes no allowance for the fact that judicial review is deferential to the Board, unless the Board's

-25-

decision is "arbitrary and capricious" or its findings not supported by substantial evidence. NLRB v. Beverly Enterprises-Massachusetts, Inc., 174 F.3d 13, 34 (1st Cir. 1999). There is no serious claim that the Board's position violates the Act, cf. NLRB v. Health Care & Retirement Corp., 511 U.S. 571, 574-584 (1994), or that it is an unreasonable interpretation of an ambiguous statute, see NLRB v. Hilliard Development Corp., 187 F.3d 133, 140-41 (1st Cir. 1999). The decision is neither arbitrary and capricious nor unsupported. Secondly, the facts as found by the ALJ simply do not raise the questions posed by North Atlantic. The ALJ found that the activities of the supervisor were so minimal that no "reasonable possibility" of taint emerged. That was so whether or not management knew of Custer's activities. Thirdly, we think that North Atlantic may overread Island Films. We do not, initially, read it as saying that no proof of coercion, either express or implied, need be offered.[7] Although Island Films purported to

---

[7] If, on the other hand, we misunderstand Island Film and it does hold that mere supervisory status alone compels a finding of coercion, or to use the language of that opinion, that such status alone is sufficient to show that the activity reasonably tends to have a coercive effect, then the Board is correct that such a rule is in conflict with First Circuit law,

-26-

establish a standard that "[s]upervisory activity need only 'reasonably tend' to have a coercive effect on or 'likely to impair' [sic] an employee's choice," 784 F.2d at 1451, we do not take that language as intended to establish a new standard of judicial review, as North Atlantic here suggests, apart from the usual abuse of discretion and substantial evidence standard, which we apply.  The Ninth Circuit itself has disavowed these two readings of <u>Island Film</u>.  <u>See</u> <u>Napili Shores Condominium Homeowners' Ass'n</u> v. <u>NLRB</u>, 939 F.2d 717, 718-19 (9th Cir. 1991) (applying usual deferential standard and holding that pro-union supervisory participation does not per se invalidate election).

For these reasons, we grant the Board's petition for enforcement of its orders and dismiss North Atlantic's petition for review.

---

by which we are bound.