# United States Court of Appeals
## For the First Circuit

No. 14-1917

NATIONAL LABOR RELATIONS BOARD,

Petitioner,

v.

LE FORT ENTERPRISES, INC.
d/b/a MERRY MAIDS OF BOSTON,

Respondent.

PETITION FOR ENFORCEMENT OF AN ORDER OF
THE NATIONAL LABOR RELATIONS BOARD

Before

Howard, <u>Chief Judge</u>,
Selya and Kayatta, <u>Circuit Judges</u>.

<u>Richard F. Griffin, Jr.</u>, General Counsel, <u>Jennifer Abruzzo</u>, Deputy General Counsel, <u>John H. Ferguson</u>, Associate General Counsel, <u>Linda Dreeben</u>, Deputy Associate General Counsel, <u>Robert J. Englehart</u>, Supervisory Attorney, and <u>David A. Seid</u>, Attorney, on brief for petitioner.
<u>Scott Kamins</u> and <u>Offit Kurman, PA</u> on brief for respondent.

July 1, 2015

**KAYATTA**, **Circuit Judge**. Le Fort Enterprises, Inc. ("Le Fort") does business as a "Merry Maids" franchise, providing cleaning services, primarily to homeowners in and around Boston, Massachusetts. Le Fort serves approximately 500 customers, generates annual sales in excess of $1,000,000, and employs twenty-nine housekeepers. Some of the housekeepers decided to try to unionize. Over Le Fort's objection, the National Labor Relations Board ("the Board") asserted jurisdiction and conducted a secret-ballot election among the twenty-nine housekeepers. By a vote of 16 to 12 (with one challenged ballot), the employees voted to select the International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers, Local 7, AFL-CIO ("the Union") as their exclusive collective-bargaining representative. Rejecting Le Fort's challenge to the election, the Board certified the Union in accord with the employees' vote. Le Fort then refused to bargain with the Union, triggering a charge of unfair labor practices and a Board order directing Le Fort to bargain. See Le Fort Enters., Inc., 360 N.L.R.B. No. 119 (May 22, 2014). The Board now petitions this court pursuant to 29 U.S.C. §§ 159(d) and 160(e) to enforce the Board's unfair labor practice order. For the following reasons, we reject Le Fort's objections to the Board's jurisdiction and the election, and grant the Board's petition.

## I.  The Board's Jurisdiction

Congress empowered the Board "to prevent any person from engaging in any unfair labor practice . . . affecting commerce." 29 U.S.C. § 160(a).  "Congress intended to and did vest in the Board the fullest jurisdictional breadth constitutionally permissible under the Commerce Clause."  NLRB v. Reliance Fuel Oil Corp., 371 U.S. 224, 226 (1963) (per curiam); accord NLRB v. Living & Learning Ctrs., Inc., 652 F.2d 209, 212-13 (1st Cir. 1981).  Le Fort does not claim that it falls outside that broad statutory grant of jurisdiction.

Le Fort relies instead on the Board's self-imposed adoption of discretionary limits on the exercise of its jurisdiction.  See Siemons Mailing Serv., 122 N.L.R.B. 81, 82-83 (1958).  Adopted in order to conserve and efficiently deploy the Board's limited resources, see id., these limits are expressed as minimum levels of business activity, with differing benchmarks for retail and non-retail employers.  See Bussey-Williams Tire Co., Inc., 122 N.L.R.B. 1146, 1147 (1959).  The Board exercises jurisdiction over a retail enterprise if it has a gross annual business volume of at least $500,000.  NLRB v. Pizza Pizzaz, Inc., 646 F.2d 706, 707 (1st Cir. 1981) (per curiam) (citing Carolina Supplies & Cement Co, 122 N.L.R.B. 88, 89 (1958)).  The Board exercises jurisdiction over a non-retail enterprise if its gross outflow or inflow of commerce across state lines is at least

$50,000.  NLRB v. Somerville Const. Co., 206 F.3d 752, 755 (7th Cir. 2000); Siemons Mailing Serv., 122 N.L.R.B. at 84-85.

The Board found Le Fort to be a retail enterprise because its sales were "sales to a purchaser who desires 'to satisfy his own personal wants or those of his family or friends.'" J.S. Latta & Son, 114 N.L.R.B. 1248, 1249 (1955) (quoting Roland Elec. Co. v. Walling, 326 U.S. 657, 674 (1946)).  With annual sales of over $1,000,000, Le Fort easily fits within the Board's jurisdiction, even as limited by the Board, if it is indeed a retail enterprise. Le Fort therefore argues that the Board erred in classifying it as a retail business, and that the company does not otherwise satisfy the discretionary standard for exercising jurisdiction over non-retail businesses.

Such a challenge to the Board's application of its self-imposed jurisdictional reach by a company that falls within the Board's broad statutory grant of jurisdiction faces a steep uphill climb.  We will enforce against the Board its own self-imposed jurisdictional limits only in "extraordinary circumstances" or where the Board has abused its discretion.  Pizza Pizzaz, Inc., 646 F.2d at 708 ("Where statutory jurisdiction exists . . . the Board has the administrative discretion to disregard its own self-imposed jurisdictional yardstick. . . . When the Board disregards its own self-imposed jurisdictional guidelines in asserting jurisdiction on an ad hoc basis, the courts should not intervene

unless compelled to do so by extraordinary circumstances, or unless the Board has abused its discretion." (quoting NLRB v. Erlich's 814, Inc., 577 F.2d 68, 71 (8th Cir. 1978))).

Here, there is no plausible basis for arguing that the Board disregarded its discretionary jurisdictional standards in classifying Le Fort as a retail enterprise, much less that it did so in extraordinary circumstances. As the Board found, and Le Fort concedes, Le Fort "provid[es] home cleaning services to residential customers." Le Fort's owner testified that his employees "just clean houses" "99 percent of the time." Le Fort is therefore a retail enterprise with annual revenues in excess of $500,000, and fits well within the Board's jurisdiction, even as limited by the Board. Le Fort's only argument to the contrary relies on cases involving other cleaning companies determined to be non-retail businesses. In each of those cases, though, the employer provided cleaning services to commercial and institutional clients, and not primarily to homeowners. Serv. Emp. Int'l Union Local 1877, 345 N.L.R.B. 161, 162 (2005) (three employers provided services to commercial clients); Bergensons Prop. Servs., Inc., 338 N.L.R.B. 883, 884-85 (2003) (employer provided services to a university); West Side Carpet Cleaning Co., 136 N.L.R.B. 1694, 1695 (1962) (enterprise provided services to commercial and residential customers), enforced, 329 F.2d 758 (6th Cir. 1964).

## II.  Le Fort's Objections to the Election

### A.  Factual Background

The facts relevant to the election are largely undisputed.  The secret-ballot voting occurred in the kitchen of the single building from which Le Fort operated.  To enter the kitchen, employees walked into the building's foyer, crossed fourteen feet through the foyer into a hallway, passed through a steel door into a two-bay garage, and then walked another fifteen feet across the garage to a door into the kitchen.

During the voting, approximately eight employees gathered in the foyer.  Some of these employees made remarks to other workers entering or leaving the foyer going to or from the kitchen.  The comments included the following:

- Four employees were told (or overheard others saying) that whoever did not vote for the Union would be dismissed, or that new employees would be dismissed if they voted "no."[1]

- After they voted, one of those same four employees, plus two other employees, were told that, if the Union won, undocumented employees would be fired.[2]

---

[1] E.g., "whoever doesn't vote for the Union is going to be thrown out, for example, the new ones."  One of the four employees did not hear the threat until after she had voted.

[2] E.g., "the persons who did not have papers within the Company, if the Union would win, they were going to be thrown out."

- Three other employees were told things like "[w]e're counting on your vote," "[w]e need you on our side," or "you know how you're going to vote."

Additionally, an employee listening from another room overheard those gathered in the foyer making derogatory remarks about managers and employees who opposed the Union.[3] None of the electioneering occurred in any designated "no electioneering" area. Nor were any officials or agents of the Union involved.

The hearing officer, and then the Board in affirming the hearing officer, found that none of the foregoing conduct required setting aside the election results. Le Fort now challenges that conclusion, contending that the Board improperly relied on its finding that Union agents did not make the various remarks, and that the Board abused its discretion in concluding that the various comments, viewed collectively, did not warrant setting aside the election results.

## B. Standard of Review

"In reviewing the Board's findings and conclusions on the conduct of elections, the Board is entitled to a 'wide degree of discretion' in establishing what 'safeguards [are] necessary to insure [that the outcome reflects a] fair and free choice of

---

[3] E.g., "pieces of trash," "prostitutes," "crackheads," and "hag."

bargaining representatives by employees.'" Hosp. Gen. Menonita v. NLRB, 393 F.3d 263, 266 (1st Cir. 2004) (alterations in original) (quoting NLRB v. A.J. Tower Co., 329 U.S. 324, 330 (1946)).  The Board's findings of fact will stand if supported by substantial evidence.  29 U.S.C. § 160(e).  As the party challenging the election, Le Fort bears the burden of proof, and must establish that the Board abused its discretion in upholding the election. Hosp. Gen. Menonita, 393 F.3d at 266.  The Board would abuse its discretion if it used the incorrect legal standard.  NLRB v. Reg'l Home Care Servs., Inc., 237 F.3d 62, 67 (1st Cir. 2001).

## C.    Standard for Non-Party Employee Misconduct

In assessing the impact of the workers' comments, the Board determined that the workers gathered in the foyer were not agents of the Union, nor were they acting at its behest. Therefore, the Board evaluated the comments' effect on the election under a more lenient standard than it would for conduct by the agents of the Union or Le Fort.  Compare Melrose-Wakefield Hosp. Ass'n, Inc. v. NLRB, 615 F.2d 563, 568 (1st Cir. 1980) ("Under settled law, non-party statements require the setting aside of the election only when they are shown to have created such an atmosphere of fear and coercion that free choice has become impossible."); with Overnite Transp. Co. v. NLRB, 140 F.3d 259, 264 (D.C. Cir. 1998) ("Where election misconduct is attributable to one of the parties, the Board will overturn the election if the

- 8 -

misconduct created such an environment of tension and coercion as to have had a probable effect upon the employees' actions at the polls and to have materially affected the results of the election." (internal quotation marks omitted)).

Le Fort does not challenge the finding that the employees gathered in the foyer were not agents of the Union or acting at its behest, and that therefore they were not parties to the election. Rather, Le Fort argues that the Board, allegedly contrary to our precedent, placed too much emphasis on this finding. Le Fort claims that "the Board was wrong when it stated that because co-workers made these threats[,] this somehow nullified their credibility or their coercive nature." In this manner, argues Le Fort, the Board ran afoul of our precedent holding that a finding that remarks are made only by non-parties does not preclude a finding of relevant coercion. See, e.g., NLRB v. Newly Weds Foods, Inc., 758 F.2d 4, 10 (1st Cir. 1985) ("One employee's remark to another can be coercive even though the speaker is not a union agent."); NLRB v. Int'l Equip. Co., 454 F.2d 686, 688 (1st Cir. 1972) ("[A]bsence of union culpability does not suffice if in fact an atmosphere of fear and coercion existed[.]").

This argument fails to get out of the starting blocks. The Board did not find that the non-party status of the hecklers "nullified" the credibility or coercive nature of the comments.

To the contrary, it examined the circumstances to determine whether and to what extent the comments were credible and coercive enough to render free choice impossible.  In this manner, the Board followed both its precedent and ours.  See Westwood Horizons Hotel, 270 N.L.R.B. 802, 803 (1984) ("[T]he test to be applied is whether the misconduct was so aggravated as to create a general atmosphere of fear and reprisal rendering a free election impossible."); see also Melrose-Wakefield Hosp. Ass'n, Inc., 615 F.2d at 568 (calling the non-party standard "settled law").  In sum, we find no error in the standard employed by the Board.

**D.   Applying the Standard to the Employees' Comments**

We turn next to Le Fort's principal argument:  that the nature of the comments made by the non-party employees compelled the Board to find that free choice was not possible.  To assess that argument, we consider first the comments by category, and then cumulatively.  As did the hearing officer and the Board, we consider the following five factors to determine whether the threats created a general atmosphere of fear and reprisal that made a free election impossible: (1) "the nature of the threat itself"; (2) "whether the threat encompassed the entire bargaining unit"; (3) the extent of dissemination; (4) "whether the person making the threat was capable of carrying it out, and whether it is likely that the employees acted in fear of his capability of carrying out the threat"; and (5) whether the threat occurred "at

- 10 -

or near the time of the election." Westwood Horizons Hotel, 270 N.L.R.B. at 803; accord Deffenbaugh Indus., Inc. v. NLRB, 122 F.3d 582, 586 (8th Cir. 1997).

We begin with the most serious threats made: the threats that undocumented employees would be turned in when the Union won the election. While such threats certainly warrant scrutiny, the Board did not abuse its discretion in concluding that the particular threats made here did not overbear the free choice of any voters in a manner that prejudiced Le Fort. First, all three employees who heard these threats had already voted, and there was no evidence that these threats were disseminated beyond those three original listeners. Second, even if an employee had heard the threat before voting, the threat would have more likely induced an undocumented employee to vote against the Union, not for it. The gist of the threat, after all, was that, if the Union won, undocumented employees would be fired, no matter for whom they voted.[4] We fail to see how such threats could have disadvantaged Le Fort.

---

[4] Le Fort tries to characterize these threats as threats that the undocumented employees would be ousted if they did not support the Union, but the transcripts of the hearing do not support this reading. The threats as transcribed were as follows: "when the Union enters, when they enter into the Company, that they win, those of us workers that do not have legal documents would be fired from the Company. The Union was going to remove us from the Company"; "the persons who did not have papers within the Company, if the Union would win, they were going to be thrown out"; and "the persons who did not have documents would be removed . . .

The analysis changes when we consider the threats that the Union would secure the firing of those, especially new employees, who did not vote for it. Those threats were directed to at most five employees.[5] Three of these employees had not yet voted. And the threats were aimed at those who voted in a particular manner. Thus, if an employee viewed the threat as credible, and believed that the Union might win, she might protect herself by voting for the Union. The problem for Le Fort is that nothing about the nature of the threat compelled a finding that it was credible. There is no evidence that any of the employees might have thought that the Union would know for whom each person voted in a secret-ballot election. Also, as found by the hearing examiner, the rank-and-file employees conveying the threats did not have the authority to carry out any firings. Finding threats of this nature not credible comports with Board precedent, NLRB v. Downtown Bid Servs. Corp., 682 F.3d 109, 116-17 (D.C. Cir. 2012);

---

[b]y the Union. In other words, if the Union won the persons who did not have documents would be removed." We agree with the hearing officer that the plain import of these threats was that undocumented employees would be fired at the Union's behest, regardless of whether they had supported the Union.

[5] It is unclear how the hearing officer arrived at five, and not four, employees. It appears that the hearing officer may have double-counted one employee who heard the threats.

In Re Accubuilt, Inc., 340 N.L.R.B. 1337, 1338 (2003), and we see no reason not to defer to such a finding here.[6]

We consider next the electioneering comments (e.g., "we're counting on your vote") and name-calling (e.g., "crackheads" and "pieces of trash"). Neither rose to the level of compelling a conclusion that the election results were tainted. The remarks were made outside any designated "no electioneering area," by non-party co-workers, and were not directed at listeners standing in line waiting to vote. See Overnite Transp. Co., 140 F.3d at 269-70; Boston Insulated Wire & Cable Co., 259 N.L.R.B. 1118, 1119 (1982), enforced, 703 F.2d 876 (5th Cir. 1983). The foyer in which the comments were made was separated from the polling room by at least 15 feet of garage bays and a closed steel door. An election observer stationed in the polling room testified that she heard outside voices, but that the voices were neither loud nor distinct. In short, Le Fort has given us no reason to disturb the Board's conclusion that the relatively mild, "rah-rah" electioneering comments to workers on their way to the polling place and the childish name-calling did not interfere

---

[6] We note too that, as with the threats to undocumented employees, some of the threats to new employees were ambiguous as to who (the employer or the Union) would be responsible for the firing: "[i]f I wanted to get more pay I had to vote 'yes' because otherwise all of the new people were going to be fired"; and "if you're new you're going to be thrown out". Le Fort makes no claim that the hecklers could have been credibly viewed as speaking on behalf of the employer.

significantly with voters' free choice.  See Deffenbaugh Indus.,
Inc., 122 F.3d at 586 ("[A] certain measure of bad feeling and
even hostile behavior is probably inevitable in any hotly contested
election[.]" (internal quotation marks omitted)).

Finally, given how non-existent or minimal the impact of
any of these comments was, the Board was not compelled to find
that, cumulatively, they precluded the holding of a fair election.
Le Fort complains that the Board did not "analyze[] and develop[]
. . . in the underlying proceedings" whether the cumulative impact
of the conduct justified setting aside the election.  The hearing
officer did not separately and explicitly discuss the cumulative
effect of the comments.  However, Le Fort did not ask that the
hearing officer undertake such a discussion.  Rather, it was not
until Le Fort filed its exceptions to the hearing officer's report
and recommendation that Le Fort raised the issue of cumulative
effect.  The Board, after adopting the hearing officer's findings
and recommendations, responded that it "f[ou]nd no merit to [Le
Fort's] contention on exception that the cumulative impact of the
conduct warrants setting aside the election."  Le Fort Enters.,
Inc., Case No. 01-RC-097257, 2013 WL 6252456, at *1 n.2 (Dec. 3,
2013).

After putting aside Le Fort's bluster, and viewing its
challenge in its totality, we are left with little more than brief,
ambiguous, rumored threats to three employees who had not yet

voted, made by co-workers without authority to carry out the threats, and in the context of taunting and cajoling during a hotly contested election. Though the voting atmosphere may have been somewhat boisterous, Le Fort fails to satisfy its burden to show that the Board abused its discretion in concluding that the election was not so pervaded with fear and coercion as to render a free choice impossible. Melrose-Wakefield Hosp. Ass'n, Inc., 615 F.2d at 570.

## III. Conclusion

The Board's petition for enforcement is granted.